COLONIAL TRUST COMPANY, Appellant, v. Mc-MILLAN.

Division One, May 24, 1905.

1. **FINDING OF FACT: Trial By Judge: Appellate Practice.** In an action at law tried to the court sitting as a jury, the finding of facts is as binding on the appellate court as the verdict of a jury would be. The appellate court has nothing to do with the weight of the evidence in such case; and if there is substantial evidence sustaining the finding, that finding will not be interfered with by the appellate court.

2. **CORPORATIONS: Watered Stock: Knowledge of Character.** Fully paid and non-assessable stock of a corporation organized for the purpose of consolidating into one company the franchises, properties and business of other companies, which are heavily indebted and insolvent, and where the only property of the new company is that transferred to it by the others with their debts still subsisting, is "watered stock."

3. ———: ———: **Creditor's Right: Knowledge.** Where the creditor with whom certain stock, reciting it was fully paid, was placed as collateral security for a debt made by the company issuing the stock, knew that it was not fully paid and that the company issuing it was without property and had been from its

Trust Co. v. McMillan.

incorporation, he is not entitled to recover from the person to whom such stock was issued, the difference between its simulated value and its real value, for in such case it cannot be held that the creditor extended credit to the company issuing it on the faith that it was or was being fully paid in money or money's worth.

4. ———: ———: ———: **Pledge.** Stock issued to its holder to be held by him as a pledge for the performance of an agreement is not his stock, and the creditor of the company cannot recover from him on the ground that it falsely recited that it was fully paid.

5. ———: **Collateral Security: Pledge.** Stock delivered to defendant for the sole purpose of securing his release from an underwriting agreement is a pledge, whether issued to him directly or to the pledgor.

6. ———: **Stock: Owner.** The fact that stock was issued directly to the pledgee and stood in his name on the company's books, is not conclusive of his ownership of the stock.

7. ———: ———: ———: **Resignation of Officers.** The fact that, when certain stock was placed in defendant's name to be held by him (or by the plaintiff trust company under an agreement) as security for the performance of an agreement by the pledgor to sell the company's bonds, which defendant had underwritten, at a certain price, he demanded and received the paper resignation of the directors and officers of the company, which he never acted upon, is not significant as showing him to be the owner of the stock, but should be considered as an auxilliary prod in his hands wherewith to goad the pledgor into the performance of his agreement.

8. ———: ———: ———: **Forfeiture.** A clause in an agreement between the person to whom certain stock was issued and the promoter of the company, that after ninety days, if the promoter did not relieve defendant from all responsibility under an underwriting agreement, the stock was to become defendant's, did not transfer the stock to defendant, but is to be considered in the light of a forfeiture.

9. ———: ———: **Pledgee's Liability.** Under the statute of this State no person holding stock of a corporation as collateral security is liable for the debts of the corporation, nor liable because the stock so held falsely recites that it is fully paid.

Appeal from St. Louis City Circuit Court.—*Hon. Horatio D. Wood*, Judge.

AFFIRMED.

*W. J. Stone, Judson & Green* and *R. T. Brownrigg* for appellant.

(1) The stock was not in fact full paid. This point was conceded by the learned judge of the circuit court, and the facts of the case were stronger on this point than in the cases of: Van Cleave v. Berkey, 143 Mo. 109; Berry v. Rood, 168 Mo. 316; see, also, Mo. Const., art. 2, sec. 8; 1 Cook on Stock and Stockholders (4 Ed.), 435; Shickle v. Watts, 94 Mo. 410. (2) Defendant was a stockholder in the Sedalia Electric Railway Company. (a) The court clearly erred in its declarations for defendant that the relation was one of pledge, requiring formal foreclosure. (b) The contract between Stewart and defendant was a conditional sale and not a pledge. Jones on Pledges, secs. 7, 9 and 154; Leavell v. Robinson, 2 Leigh (Va.) 161; Moss v. Green, 10 Leigh (Va.) 251; Lauman Appeal, 68 Pa. St. 88; Boynton v. Woodburn, 101 Mass. 346; Crump v. McCormick Co., 71 Fed. 356. (c) The court proceeded on the theory that parties could not make a contract of conditional sale. This was clearly error. Page v. Shoenwald (N. Y.), 62 N. E. 356; Dos Passos on Stock Brokers, 658; 2 Cook on Corporations (4 Ed.), sec. 464; Jones on Chattel Mortgages, secs. 6-8; Chouteau v. Allen, 70 Mo. 330; 2 Thompson on Corp., sec. 2616. (d) As the facts were undisputed, the court should have construed the contract according to its terms and the interest of the parties This is the rule even in contracts of pledge. Chouteau v. Allen, 70 Mo. 296. (e) As this was not a contract of pledge, the cases cited by respondent as law of pledge are not applicable. (3) Defendant had full notice and was charged with full knowledge of the fictitious capitalization of the property. Van Cleave v. Berkey, 143 Mo. 109; Berry v. Rood, 168 Mo. 316.

*Edward S. Robert* for respondent.

(1)    Appellant recognizes that this is an action at law: ''The case was submitted to the court sitting as a jury.'' ''A jury was waived and the cause was submitted to the court.'' (a)  As this suit was brought by a single creditor for and on behalf of itself alone, and in which it seeks to recover from a single alleged stockholder, it is an action at law. 1 Cook on Corp., secs. 203, 205; Perry v. Turner, 55 Mo. 418. (b)  The common law liability for the stock owned and any amount unpaid thereon remains unaffected by the constitutional amendment of 1870. Schricker v. Riding, 65 Mo. 216. (c)  ''The right to maintain this suit'' (an action on stockholder's liability) ''and recover any unpaid balance on this stock does not depend upon equitable rights, but upon principles of public policy, and the letter of the Constitution and the statute.'' Wilson v. Railroad, 120 Mo. 56. (2)  The findings of the trial court are binding on this court. Waddell v. Williams, 50 Mo. 216; Easley v. Elliott, 43 Mo. 286; Wilson v. Railroad, 46 Mo. 36; Wielandy v. Lemuel, 47 Mo. 322; Tucker v. Railroad, 54 Mo. 177; Hamilton v. Boggess, 63 Mo. 243; Bartlett v. Kauber, 97 Mo. 356; Sutter v. Roeder, 149 Mo. 297; Zimmerman v. Railroad, 156 Mo. 561; De Lassus v. Faherty, 164 Mo. 361; Smith v. Royse, 165 Mo. 654; Kirton v. Bull, 168 Mo. 622; Comer v. Statham, 173 Mo. 246. (3)  The stock was delivered to the defendant for the sole purpose of securing his release from the obligation of the underwriting agreement and is, therefore, a pledge. Hart v. Burton, 7 J. J. Marsh (Ky.) 222; Kingsbury v. Phelps, Wright (Ohio *Nisi Prius*), 370; Luckett v. Townsend, 3 Tex. 119; Marshall v. Williams, 2 Hayed (N. C.) 405; 2 Story on Eq. Juris., sec. 1009; Ibid, 103; 2 Kent's Com., 583; Falkord's Law of Pawnbrokers, p. 11, n. f. cited in note 18 Am. and Eng. Ency. Law, 721; 1 Story, Bailments, secs. 318, 345, 346; 1 Jones, Pledges, sec. 554; Derrill

v. Eaton, 35 Mich. 301.   (4) Where one assumes a liability for another and receives property to secure him in case of loss, he is a pledgee.   Allgear v. Walsh, 24 Mo. App. 134; Vest v. Greene, 3 Mo. 219.   Mere knowledge on the part of a creditor that the capital stock has been paid up by turning in property, at a fictitious valuation, will estop him from recovering against a shareholder. Berry v. Rood, 168 Mo. 316.

LAMM, J.—In an action at law, tried to the court without a jury, the plaintiff, as a judgment creditor of the Sedalia Electric and Railway Company, referred to herein as the Railway Company, seeks to hold defendant liable as a stockholder, owning 2594 shares of unpaid capital stock of said Railway Company, of the par value of $259,400, for the sum of $47,076.75, said judgment debt.   The result of the trial was a judgment for defendant, from which plaintiff appeals.

It will contribute to an understanding of the case to state the paper issues which are substantially as follows:

After alleging its incorporation and citizenship in New York, and the incorporation of the Sedalia Electric and Railway Company under the laws of the State of Missouri, the petition avers that said Railway Company became indebted to the plaintiff, for money loaned, in the sum of $105,000, evidenced by a promissory note dated the 1st of November, 1898, due in one year, with interest at the rate of six per cent, payable quarterly, which note was indorsed and guaranteed by Stewart & Co., and was secured by the pledge of certain bonds and stock of said Railway Company as collateral; that payments were made by said makers, indorsers and guarantors, and by the sale of said pledged collateral, whereby the principal was reduced to $44,550, which, with interest, remained due and unpaid to plaintiff.   That on the 17th of Octo-

ber, 1900, plaintiff, having theretofore instituted suit against said Railway Company in the circuit court of the United States in the central division of the western district of Missouri to recover said balance, did recover the same with costs, and thereafter sued out execution, upon which the marshal made return of *nulla bona;* that said Railway Company is wholly insolvent and has ceased to do business or to perform any of the purposes of its creation and has ceased to be actively governed, managed or controlled by its board of directors or officers, and has become virtually defunct and dissolved; that said indorser and guarantor, Stewart & Co., was one Stanley H. G. Stewart, who did business as a "banker or broker" in the city of New York and is now insolvent; that the bonds and stock pledged for the payment of said note were sold by plaintiff and the net proceeds applied on the note; that said judgment of the Federal court remains wholly unpaid; that said Railway Company was organized with a capital stock of $400,000, divided into 4,000 shares of the par value of $100 each; that defendant is owner and holder of 2594 shares of said capital stock, originally subscribed by one Reeve, who paid nothing on said stock in money, property or services, notwithstanding which the shares of stock were issued to him; that on the 9th day of December, 1898, Reeve transferred his said stock certificates to defendant, so that he became and was thereafter the owner of said stock; that defendant well knew Reeve had paid nothing on said stock, knew the whole amount of Reeve's stock subscription was still due said Railway Company and knew that said Railway Company was at the time largely indebted to plaintiff and other creditors; that by reason of the premises defendant is indebted to said Railway Company in the sum of $259,400, whereby a right had accrued to plaintiff as a creditor to have and recover from the defendant the amount due plaintiff by said Railway Company, to-wit,

the said sum of $47,076.75, together with interest at six per cent since the 17th day of October, 1900, etc.

The case was tried on an amended answer admitting the incorporation of the plaintiff, the incorporation of the Railway Company, its original indebtedness to plaintiff in the sum of $105,000, evidenced by the note referred to; admitting that Stewart & Co. indorsed and guaranteed the note and that certain bonds and stocks were pledged to secure its payment as alleged; admitted the Railway Company was organized with the amount of capital stock and number of shares and par value of each share as alleged, and admitting the stock was originally subscribed by Reeve, but denying *seriatim* and specifically the other allegations in the petition.

For affirmative defense, the answer pleads that at the time the stock was issued it was agreed by the Railway Company and the stock subscribers that the Railway Company should accept the conveyance of certain real estate, buildings, apparatus, electric light plant, electric street railway plants, and other property, interests and franchises in full payment for all stock to be issued; that said Railway Company would issue such stock fully paid and non-assessable, and that no persons holding any of said stock should remain or be liable for any further payment on account of the same; that the conveyances aforesaid were made and the agreement completed, the Railway Company put in possession, etc., and the said stock was so issued and delivered and bore upon its face the express agreement that it was fully paid and non-assessable; that the property, interests, franchises, etc., so conveyed, were at the time of a value equal to the face value of said stock; that at the time and in said matters the directors of said Railway Company and its officers and all persons connected with said transaction acted in good faith and in the honest belief that the value received by the Railway Company was equal to the amount of the face

value of the stock, and all said directors, officers and persons exercised all reasonable caution and their best judgment in the premises, etc.

For a further defense it is alleged that before it advanced money to said Railway Company upon said $105,000 note and at the time, plaintiff had full notice of said facts connected with the issuance of said stock as well as of the value of the franchises, interests, etc., conveyed to said Railway Company as a consideration for the stock, of the amount of stock issued and its full value, of the business to be conducted by said company, and of the plan of its organization, capitalization and operation.

As a further defense it was alleged that at the instance and request of said Stewart, and after plaintiff had agreed to make said $105,000 loan, defendant executed a certain underwriting agreement to which Stewart & Co., other underwriters and plaintiff were parties, whereby defendant agreed that he would, if required so to do by plaintiff, any time between the 1st day of September, 1899, and the 2d day of October, 1899, but not otherwise, purchase and take from plaintiff sixty bonds and 600 shares of the capital stock of said Railway Company, then in the hands of plaintiff, and that he would in that case pay therefor at the rate of $750 for each bond, together with ten shares of said stock (said plaintiff, however, having the privilege of selling said bonds and stock to others upon terms set forth in said underwriting agreement), and for the purpose of inducing him to execute it, said Stewart agreed he would secure other persons to underwrite the bonds and stock so underwritten by defendant and would substitute such other persons in the place and stead of defendant as a party to said underwriting agreement and would procure plaintiff to release defendant from said underwriting agreement; that to secure the carrying out of said Stewart's agreement, he, Stewart, caused to be issued and lodged with defendant a cer-

tificate for 2594 shares of the capital stock of said Railway Company, which was received and has at all times been held by defendant as collateral security to secure his release from any obligations growing out of said underwriting agreement and to insure the substitution of other underwriters in his place and stead, and for such purpose only; that defendant is not and never was the owner of said shares of stock or any of them, but that his sole interest, so far as he had any interest, has been that of a pledgee to secure the performance by Stewart of said agreement, and that at the time of the pledge of said stock to defendant and at the time he signed said underwriting agreement, he had no notice or knowledge that the consideration given or paid said Railway Company in the issuance of its stock was of less value than the stock itself, or of any facts concerning the subscription or payment for said stock, but received and held said certificate as pledgee in reliance upon the representation contained in said certificate that the shares of stock were full paid and non-assessable.

The answer finally alleges that the underwriting agreement executed by defendant was a part of the collateral security deposited with and pledged to plaintiff to secure the payment of said $105,000 note; that by said agreement all sales of said bonds and stocks were to be received by plaintiff and applied towards the satisfaction of said note; that plaintiff did not at any time between the 1st of September, 1899, and the 2d day of October, 1899, require defendant to purchase or pay for any of said bonds or stock, but did, without defendant's consent, and in spite of the refusal of defendant to join therein, enter into another agreement with the other parties to said underwriting agreement whereby it extended said underwriting agreement and the time within which the same was to be performed, and thereby released and discharged defendant.

The reply to the amended answer denied each and every allegation thereof.

The case made on the facts is as follows:

Prior to October, 1898, there existed in Sedalia two corporations, one known as the Electric Railway, Light and Power Company of Sedalia, hereinafter referred to as the Power Company, and the other known as the Sedalia and Brown Springs Electric Railway Company, hereinafter called the Brown Springs Company. The Power Company was the elder of the two, and owned about nine miles of street railway track, a powerhouse, engines, boilers, electric generators, lighting wires, a street railway franchise in Sedalia, an electric lighting franchise, together with a park outside the city limits, and was engaged in running electric passenger cars, and the generation and sale of electricity for light and power purposes in the city. Upon all its properties and franchises was a mortgage of $200,000. The Brown Springs Company was a servient corporation owning about two miles of track, extending south from the southern terminus of the track of the Power Company, and also owning 120 acres of land and a spring, possibly of medicinal virtues, but owning no rolling stock or powerhouse, and was operated by the Power Company. On the assets and properties of the Brown Springs Company was a mortgage of $50,000, which indebtedness was guaranteed by the Power Company. These two properties were practically operated as one. Both of them were in bad condition and though the interest on the mortgage debt was kept paid, yet they had a floating indebtedness of from $50,-000 to $60,000, with an earning capacity inadequate to pay fixed charges and operating expenses, let alone to provide for needed repairs and betterments. In this condition of things Stanley H. G. Stewart, masquerading as Stewart & Co., a so-called "banker and broker" of the city of New York, appeared on the scene through a representative, made an investigation of these prop-

erties and franchises and undertook the scheme of consolidating them into a new corporation and rehabilitating the property. To this end he purchased the stock in both companies in August or September, 1898, for an uncertain consideration, which may be termed a song, assumed the payment of the floating indebtedness and, thereafter, on the 3d day of October, 1898, he caused to be organized a new corporation, the Sedalia Electric and Railway Company, as a receptacle for all said properties and franchises. This new corporation was on the basis of a capitalization of $400,000, divided into 4000 shares of the par value of $100 each. In the articles of association it was certified that "the whole amount thereof has been bona fide subscribed and all thereof actually paid up in lawful money of the United States, and is in the custody of the persons named as the first board of directors"—not one word of which was true. The uncontradicted evidence shows that it was contemplated that the stock should be and was paid for by turning over the franchises and the properties of the Power Company and the Brown Springs Company, already mortgaged far beyond their value, the cars and most of the machinery out of repair, secondhand and depreciated by wear, and it was further shown that the reasonable expectancies of these properties were not bright at the time and the companies were struggling with makeshifts from day to day to make ends meet, and insolvent. On the incorporation of the Railway Company, it took over said franchises and properties, subject to the mortgage indebtedness. Of the 4000 shares of capital stock, Reeve subscribed and received 3996 shares, which he held for Stewart. The other four shares were distributed between one De-Long, a resident of New York, and three other parties, residents of Sedalia, Missouri, to qualify them as directors.

While Mr. Stewart posed as a capitalist, he was one by way of aspiration and anticipation only. His

scheme was to issue and float a bonded indebtedness of $400,000, secured by a mortgage on the consolidated properties—$260,000 worth of these bonds were to be set aside to take up the existing and underlying mortgages on the constituent properties, and the other $140,-000 of bonds were to be floated on the markets of the East, at $750 in cash for each $1,000 bond and, as a lure to purchasers, ten shares of stock were to go with each bond as floated. As a step to float these bonds a prospectus was prepared setting forth in glowing colors the original cost and past earning capacity of the constituent companies, the consolidation, a list of assets and the properties owned, their present earning capacity, and future possibilities in the growth of the city and the increased earning capacity of the rehabilitated plant. In the prospectus the fetching bargain was offered of selling a $1,000 gold bond at $750, with ten shares of stock of the par value of $1,000 thrown in. With this prospectus in his hand he went to appellant trust company and undertook to negotiate the bonds and stock. There is evidence that on examination the scheme was rejected, at the start, and there is further evidence tending to show that the president of plaintiff, Mr. Borne, had looked into the prospectus and was aware of the fact that the stock represented what he called ''sentimental'' instead of actual value. Later, an underwriting plan was concocted and on the strength of the deposit and pledge of 140 one-thousand dollar bonds of the Railway Company, together with certificates of stock representing 1400 shares, and the execution of the underwriting agreements of defendant McMillan and others, the collateral note of the Railway Company for $105,000, due in one year, with interest payable quarterly in advance at six per cent indorsed by Stewart & Co. and guaranteed by Stewart & Co., was discounted.

Prior to and at this time respondent was surety for Stewart at the Hanover National Bank in New York

for $41,000, then over due. The Railway Company's bonds being not yet engraved and executed, an "*ad interim* bond" for $140,000 had been executed, but the evidence is not clear whether it was pledged to the defendant to indemnify him against loss as Stewart's surety at the Hanover National Bank or left with appellant trust company as temporary collateral. Be that one way or the other, respondent was secured from liability at the Hanover bank by pledge of that or other collateral.

At this stage, Stewart being pressed, as usual, for funds in his promoting schemes, applied to respondent to become an underwriter on the bonds to be deposited with the plaintiff trust company, assuring him that from the proceeds of the loan thereby secured, the indebtedness at the Hanover National Bank was to be (and was) taken up, and pressing debts against the Railway Company paid off.

As it is contended by appellant that respondent became the owner of all the stock issued by the Railway Company except such as was to be and was pledged as collateral to the appellant, and enough more to qualify the directors of the Railway Company, and as it is contended by respondent that he merely became the pledgee of such stock as collateral security against his liability and loan of credit as an underwriter, the relations between the two men at the time become material. On this head the record shows that respondent was a capitalist and the father-in-law of Stewart. The two men officed in the same building, and, were it not for the written communications passing between them and introduced in evidence, it would be difficult to believe their feelings and relations were as strained and unique as we are forced to conclude from the record before us; for they met at respondent's home and yet did not speak, but corresponded and acted through intermediaries and respondent seems to have entertained business distrust of Stewart and to have a rooted an-

tipathy for him based on alleged business injuries. Stewart, on the other hand, was compelled from a settled business policy and his family relations, to ignore the antipathy of his father-in-law and to seek his aid as a harbor when adverse financial gales blew as, under this record, they did with regularity for him. The underwriting scheme lagged, enough subscribers had not been obtained and, in this dilemma, he applied by letter to his father-in-law for help. The result was that respondent and Stewart, after propositions pro and con, entered into an agreement between themselves that respondent should go into the underwriting scheme and that Stewart would turn over to him 2594 shares of stock in the Railway Company, which agreement is best shown by the following letter from Stewart:

"Replying to your favor of the 2d and 4th, I have consulted with the attorney having charge of the matter of loan with the Colonial Trust Company, and he has agreed to undertake that providing we carry out the underwriting on the present basis, he will arrange for the substitution of name or names to take the place of yours; and I will therefore accept your offer on the basis outlined, which I understand to be as follows: In consideration of your underwriting 60 bonds as per written agreement inclosed, with ink interlineations which you will notice, I herewith place with you 2594 shares of the capital stock of the Sedalia Electric and Railway Company, issued in your name. This leaves 1400 shares to be deposited with the Trust Company under the terms of said underwriting agreement and the six shares necessary for qualifying the directors. Attached to the stock please find the resignation of the president, treasurer, assistant secretary, and majority of directors; the vice president has not been elected yet, and the secretary is in Sedalia, as it was necessary to have that officer there temporarily, until all of the papers relative to the consolidation had been properly executed, but we can have his resignation at any time

now. It is understood that if within 90 days from date we relieve you from all responsibility under said underwriting, then said stock and resignations are to be returned to us as per terms of your letter; if on the other hand you are not relieved the stock to become yours. All arrangements are made with the Trust Company and they propose to close the matter this afternoon. May I therefore suggest that you kindly sign the underwriting agreement inclosed herewith and, upon the matter being settled with the Trust Company, we will draw a check to your order for $41,000 and, upon receipt of same, you can deliver the interim bond for $140,000 to the Colonial Trust Company, getting your check cashed at the same time, which will pay for the loan at the Hanover National, minus three or four days' interest, which we will pay. If the above properly represents your wishes expressed in said letter, I will have the arrangements put in such further legal form as you may desire.

"Yours very truly,

"STANLEY H. G. STEWART.

"P. S.—After writing the above yesterday, we found the Trust Company wishes the underwriters to agree to substitution of the 'interim bond' until the permanent ones were ready (the bonds are promised Tuesday) and they are getting the agreement signed this morning by the others. It will be sent to you later."

On the strength of the agreement outlined above, respondent executed the following underwriting agreement covering sixty $1,000 bonds with plaintiff trust company:

*"Underwriting Agreement.*

"Agreement made the first day of November, 1898, between Emerson McMillan (hereinafter called the Underwriters), parties of the first part; Colonial Trust Company, of the City of New York, a corporation

organized and existing under and by virtue of the Laws of the State of New York (hereinafter called the Trust Company), party of the second part, and Stewart & Company, doing business as Bankers in the City of New York (hereinafter called the Bankers), parties of the third part.

"Whereas, Stanley H. G. Stewart of the City of New York, doing business as Bankers at No. 40 Wall Street in the said City, under the firm name of Stewart & Company, have purchased and recently consolidated the properties known as the Electric Railway, Light & Power Company of Sedalia, Missouri, and the Sedalia and Brown Springs Electric Railway Company, merging the same into a new company under the name of the Sedalia Electric & Railway Company; and

"Whereas, the Trust Company is about to make a loan of one hundred and five thousand dollars to the said Sedalia Electric & Railway Company, at the request of Stewart & Company, which loan is to be evidenced by the promissory note of the said Sedalia Electric & Railway Company, indorsed by said Stewart & Company, and payable in one year from the date of this agreement, with interest at six per cent per annum, payable quarterly in advance; and

"Whereas, said loan is to be secured by one hundred and forty of the bonds of the said Sedalia Electric & Railway Company, with fourteen hundred shares of the capital stock of the said company, said bonds and stock being now owned by said Stewart & Company; and

"Whereas, the Underwriters are desirous of purchasing certain of said bonds of the Sedalia Electric & Railway Company held under said loan;

"Now, Therefore, This Agreement Witnesseth, That the Underwriters, in consideration of one dollar and other valuable considerations, the receipt whereof is hereby acknowledged, do each for himself or themselves, and his or their heirs, executors and adminis-

trators, and not for the others, agree with the Trust Company that after the first day of September, 1899, and on or before the first day of October, 1899, the said Underwriters will purchase, upon the demand of the Trust Company, the number of bonds of one thousand dollars par value each of said Sedalia Electric & Railway Company, now in possession of the Trust Company, the number of shares of said stock of one hundred dollars par value, set opposite their respective names, and pay therefor the sum of seven hundred and fifty dollars for each bond, together with the interest thereon at the rate of five per centum per annum from the date of the last unattached coupon, and for each ten shares of stock set opposite their respective names, and will respectively pay their proportionate amount of overdue interest, if any, that may be due upon said loan after crediting the amount paid as aforesaid upon said coupons.

"Each Underwriter agrees that the Trust Company shall have the right to reduce the subscription of any Underwriter, and to make allotment in any case of less than the number of bonds subscribed for. In the event that a less number of bonds than is subscribed for shall be allotted in any case, the Underwriter or Underwriters to whom such less number of bonds may be so allotted, agrees that he or they will take and pay for such less number of bonds at the same price per bond, and upon the same terms of payment as those mentioned above.

"In case of the failure of the underwriters, or any of them, to take and pay for the said bonds at the times and as provided in this agreement, the holder of said note of said Sedalia Electric & Railway Company may, without further demand or notice, sell, assign or deliver the whole or any part of said securities not so taken and paid for, at any brokers' board in the City of New York or elsewhere, or at public or private sale, at their option, at any time thereafter, without adver-

tisement or notice, and the Trust Company shall have the right to become purchasers thereof at such sale or sales, freed and discharged from any equity of redemption; and the Underwriters severally agree that all interest and legal or other costs, charges or expenses may be deducted from the proceeds of such sale, and the residue applied on the liability or indebtedness of such defaulting Underwriter under said note and this agreement; the overplus, if any, to be returned to the Company, and if there shall be any deficiency, the several Underwriters hereby promise to pay the same so far as it may arise under their own subscriptions or default, and not otherwise.

"The Underwriters each further agree that the Bankers shall have the right to purchase from or through the Trust Company at any time on or before September 1, 1899, all or any part of the bonds for which the Underwriters have subscribed, at the price of not less than seven hundred and fifty dollars and accrued interest per bond, and each ten shares of stock, but in such event the Trust Company shall apply seven hundred and fifty dollars and accrued interest per bond for the bonds and stock so sold, to the payment of the loan mentioned herein, and in the event that the Bankers shall purchase all of the said bonds and stock hereby allotted to the said Underwriters under the terms of this agreement, then and in that event the Underwriters are hereby released from all further liability in the premises, and the Trust Company hereby agrees to notify them of such release.

"The Trust Company agrees that upon payment at any time after September 1, 1899, and on or before October 1, 1899, of said sum of seven hundred and fifty dollars per bond and the accrued interest thereon hereunder, it will deliver or cause to be delivered to the person entitled thereto respectively the number of said bonds and the number of said shares of stock now in its possession, for which the Underwriters have re-

spectively subscribed or which may have been allotted respectively hereunder, less their several respective proportions of any bonds and stock that may have heretofore been purchased by the Bankers, as hereinbefore provided.

"It is understood and agreed that each Underwriter shall be liable for and upon his own subscription or default, and not for or upon the subscription or default of any of the others.

"In Witness Whereof, The Trust Company has caused this agreement to be subscribed by its President, and its corporate seal to be hereunto affixed, and the Underwriters and said Stewart & Company have hereunto affixed their names, this first day of November, 1898."

Following this, the record abounds with a correspondence, curt and acrid on one side and appealing on the other, between Stewart and respondent, the purport of which was that respondent was from time to time extending the time for Stewart's compliance with the agreement to either sell the bonds pledged to the appellant trust company and take up its note and thus redeem the stock or procure other underwriters for the sixty bonds in question and take up respondent's underwriting agreement, and return the same to him, and various excuses of Stewart for not doing so, and various plans suggested whereby Stewart hoped to carry his deal and release his father-in-law.

For some reason appellant did not present the Railway Company bonds and stock to respondent between September 1, 1899, and October 1, 1899, and demand payment therefor. On the other hand, it sold its collateral, including said stock and bonds, under the terms of the pledge, and the other underwriters having complied with their agreement and the note being reduced by such compliance and by the sale of said collateral, it was finally merged into the aforesaid judgment in the Federal court and this suit was instituted.

The record shows that respondent treated the stock in his hands as a pledge and refused to act as a stockholder at any time. A certificate of stock representing the shares held by him was issued directly in his name in December, 1898, and stood in that form. The 1400 shares of stock pledged to appellant trust company were transferred on the book of the Railway Company to appellant and stood in its name. Though respondent claimed he was released on the underwriters' agreement by the failure of appellant to present the bonds between the dates provided for, yet he continued to retain the stock. The uncontroverted evidence shows, however, that appellant did not agree to his contention that he was released, but on the other hand asserted his liability under the underwriters' agreement and threatened suit thereon, and this was respondent's excuse for retaining the stock in pledge.

The record shows that receivers were appointed by the Federal court and the underlying mortgages upon the assets and properties of the two constitutent companies consolidated into the railway company, were foreclosed and the property passed to strangers. Thus the stock and bonds of the Railway Company became as waste paper and Stewart was declared a bankrupt.

The trial court found for the defendant on two grounds: "First, because the plaintiff, when it contracted this liability with the Sedalia company, knew exactly the condition of the stock. It advanced nothing upon the credit of that stock and it was endeavoring to place this watered stock upon the community in its underwriting agreement. Second, I am clearly of the opinion," says the trial judge, "that the contract that was entered into by Mr. McMillan with Stanley Stewart constituted a pledge of stock and although it contains what may properly be termed a clause of forfeiture in case the debt is not paid, courts have uniformly held, from the Roman law down to date, that such clause as that will [not?] be enforced."

I.  The trial judge found the stock to be what is known as "watered stock." That it was such, and issued without value received, is beyond question on the facts disclosed by this record. That corporations created to be the owners of public utilities should be born into a sham and crippled life, and that there seems to be a call for more adequate safeguards against the itching temptation to circumvent our corporation laws by falsehood, whereby the ancient plan for making gain by "watering stock," conceived by the shrewd old patriarch, Jacob, in dealing with Laban (Genesis, 30-30 et seq., q. v.) is parodied and brought to blush, may concern the legislative branch of the government, but cannot be remedied by the courts except in sporadic cases, where some relief may be administered if the facts allow.

Nevertheless the fact that the stock was watered is by no means decisive of the case; for in an action at law tried to the court as a jury, the finding of the trial court on the facts is as binding on us as the verdict of a jury. With the weight of evidence we have nothing to do, and if there be substantial evidence sustaining a finding, that finding will not be meddled with on appeal. [Butler Co. v. Bank, 143 Mo. 13; Comer v. Statham, 173 Mo. 246.]

So, too, it is good law that underlying the trust-fund theory and the true-value theory is the proposition that creditors have the right to assume that stock has been fully paid in money or money's worth as set forth solemnly in the articles of association of a corporation and to extend credit on the faith of such assumption, but because of this underlying proposition it follows that if a creditor of an insolvent corporation did *not* extend credit on the faith of shareholders' having paid their stock subscriptions in money or money's worth, but, to the contrary, *knew* at the time of the creation of the corporate debt that such stock was paid for in simulated values, he is not entitled to the remedy here

sought. [Berry v. Rood, 168 Mo. l. c. 333 et seq., and cases cited; Woolfolk v. January, 131 Mo. l. c. 637; 1 Cook on Corporations (5 Ed.), p. 135; and see State Trust Co. v. Turner, 111 Iowa 664, where the authorities are collected and distinguished and an elegant and exhaustive consideration is given of the doctrine here invoked.]

Applying the foregoing propositions of law to the facts of this case, we are of the opinion that even if respondent was held to be the actual owner of the stock in question, yet there is substantial evidence upon which the court below might well base its finding to the effect that appellant extended no credit to the Railway Company on the faith of its stock being full paid in money or money's worth. To the contrary, the proof tended to show that appellant knew the stock had been paid for in chips and whetstones and, when issued, represented only, what its president termed, a "sentimental value." Appellant's president investigated this scheme when it involved a purchase of the bonds and the stock. It was laid before him anew by one Birdseye, an attorney for Stewart. By a letter in evidence he certified in substance that he had investigated the plan blazoned forth in the prospectus. Now, turning to the prospectus, it flew a danger signal in that *it proposed to sell a* $1,000 *five per cent gold mortgage bond for* $775 *and to give ten shares of capital stock in a new-fledged corporation of the par value of* $1,000 *as a bonus.* On such facts, it would disturb, it seems to us, all normal methods of reasoning to conclude that a creditor who knew of such offer and whose experience in corporate stock and bond dealing enabled him to appreciate its significance, and who, as a part of the very inception of his debt, as here, undertook to finance such a company and to foist such a bond and stock sale upon a confiding public, extended credit on the faith of the fact that the corporate stock was fully paid in money or what might

be fairly considered as money's worth. One who *knows* cannot be said to be misled.

If, then, we should hold that respondent was the actual owner of the stock, we should be constrained to hold further that appellant is not entitled to the remedy it seeks in this case.

## II.

But was respondent a shareholder? The trial court found he was a pledgee of the stock and not a shareholder. Appellant insists that respondent was a shareholder and that the trial court erred in its construction of the agreement between respondent and Stewart. Light will be thrown upon this contention by recurring to fundamental legal principles. What is a pledge? A pledge had been defined to "be a deposit of personal property as security, with implied power of sale upon default;" also as "a bailment of personal property as security for some debt or engagement;" also as "a deposit of personal property by way of security for the performance of another act;" and it has been said that "every contract by which the possession of personal property is transferred as security only, is to be deemed a pledge." "The term 'collateral security' has in recent years come into general use to designate a pledge of negotiable paper, corporate stocks, or other incorporeal personalty, as distinguished from a pledge of corporeal chattels." [Jones on Pledges (2 Ed.), sec. 1.]

Referring to the agreement between respondent and Stewart whereby the former came into possession of the stock certificate, and interpreting that agreement, wherein it may be dubious, in the light of the circumstances surrounding the parties, the contemporaneous construction put on the contract by the parties to it and the construction placed thereon by them continuously thereafter; remembering, too, that the record discloses that respondent did not want to invest in the

stock or bonds as an out-and-out purchaser; that he entered into the matter reluctantly and only to protect the affairs of his daughter's husband from an impending crash, we see no difficulty in agreeing with the learned trial judge that this was not a sale or a conditional sale of the stock with the mere right to repurchase in Stewart, but came clearly within the definition of a pledge.

Nor can the fact urged here, that the stock was placed in the name of respondent on the books of the corporation and that a certificate was issued directly to him, be allowed to alone dominate the situation and characterize him as a shareholder. [Union Savings Association v. Seligman, 92 Mo. 635.] If the fact that the stock stood in the name of respondent be allowed as conclusive on the question of ownership, it would lead to singular and embarrassing results; for the proposition would become a two-edged sword and cut both ways, since by the same token appellant became a stockholder when it had its pledged stock similarly transferred to it on the corporate books, and we would have the anomalous sight of one shareholder suing another on the theory that the stock was paid for in mere colorable values.

Nor do we place any significance upon the fact that respondent demanded and received the resignation of all of the directors and officers of the corporation, for he never acted on this paper resignation, nor did he act in the capacity of a shareholder at any time, and the paper resignation of the directors and officers, in the light of the record, must be held merely as an auxiliary prod in his hand—a wherewithal to goad Stewart into performing the principal obligation wherein respondent had loaned his credit and wherein he held the stock as security to indemnify him against loss by that loan of credit.

The clause in the agreement between respondent and Stewart to the effect that after 90 days, if Stewart

did not relieve him from responsibility under the underwriting, the stock was to become respondent's, is insisted on as transferring title to respondent. But that clause, in our opinion, should be considered in the light of a forfeiture, which would not *ex vi termini* constitute respondent the owner of the stock. This contract was made in New York, the parties resided in New York and the stock was pledged and held there. In this condition of things respondent introduced in evidence two decisions of the appellate courts of that State:. Stoker v. Cogswell, 25 How. Prac. 267,; Markham v. Jaudon, 41 N. Y. 235, construing similar contracts of pledging to not vest the stock absolutely in the pledgee on default, but requiring at his hands a sale by judicial process or upon giving notice in order to cut off the claims of the pledgor in the stock. So that, if the *lex loci contractus* is to be read into the agreement, the matter is concluded by these decisions.

By section 1324, Revised Statutes 1899, it is provided as follows:

"No person holding stock in the corporation, as executor, administrator, guardian or trustee, and no person holding such stock as collateral security, shall be personally subject to any liability as stockholder in such corporation; but the person pledging such stock shall be considered as holding the same, and shall be liable as stockholder accordingly. And the estate and funds in the hands of such executors, administrators, guardians or trustees shall be liable in like manner and to the same extent as the testator or intestate or the ward or person interested in such trust fund would have been if he had been living and competent to act and hold the same stock in his own name."

If the above statute is to be given effect and we are to hold, as we do, that the contract in question is that of a pledge, the question in hand is set at rest. For this statute was construed in the Seligman case. supra; by the Supreme Court of the United States in Burgess

v. Seligman, 107 U. S. 20; and by the appellate courts of the States from which it was borrowed, Matthews v. Albert, 24 Md. 527; and McMahon v. Macy, 51 N. Y. 155, to have the effect of denying the remedy sought in this suit, under the facts disclosed by this record.

The instructions given on both sides indicate that the trial court entertained a correct view of the principles of law applicable to the facts proved, and we are of opinion that no error exists, and, therefore, affirm the judgment.

All concur, except *Marshall, J.,* not sitting.