JONES, Chief Judge,
delivered tbe opinion of tbe court:
Two of these four actions consolidated for trial (Nos. 362-56 and 364-56) seek recovery of corporate income and excess profits taxes assessed against a corporation, Ocbs Brothers, Incorporated, for tbe fiscal years ending January 31, of each of tbe years 1943 through 1947. Such assessments were paid in 1950 by tbe individual plaintiffs, Alfred L. Ochs and Donald F. Ochs.[1]
Tbe other two suits involve the assessment for calendar year 1947 of personal income taxes against Alfred and Donald Ocbs and their wives. This assessment was based on the theory that Ochs Brothers, Incorporated, was liquidated and its assets distributed during that year, causing the realization of a long-term capital gain by the distributees, the Ochs brothers. The legal aspects of the two problems as briefly outlined above will be discussed separately, although some of the facts presented below are common to both.

Cases Nos. 862-56 and 361¡.-56

Ochs Brothers, Incorporated, was created as a mercantile corporation under the laws of Minnesota on March 24,1914, *118 for a period of 30 years. As is pertinent to these cases, Alfred and Donald Ochs owned all the shares, except for one directorship qualifying share. Without plaintiffs’ knowledge, the corporate charter expired on March 25, 1944. It is not disputed that under state law such expiration terminated the corporation’s existence save for the purpose of closing up its affairs.[2] Not until December 1947 were plaintiffs aware of these circumstances.
Plaintiffs’ discovery was subsequent to an audit by the Internal Revenue Service earlier in 1947 which culminated in. a report concerning proposed deficiencies for the fiscal years ending on January 31, of 1943, 1944, and 1945. In April 1949, forms entitled “Consent Fixing Period of Limitation Upon Assessment of Income and Profits Tax,” were executed for these years in the corporate name, bearing the corporate seal, and signed by “Alfred L. Ochs, former President.” After several conferences with the Service, a “Waiver of Restriction on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessments” was signed in November of 1949 by Alfred L. Ochs on behalf of Ochs Brothers, Incorporated, for deficiencies proposed for each of the fiscal years ending January 31, of 1943, 1944, and 1945.
In January 1950, after audit of corporate returns for the fiscal years ending January 31, of 1946 and 1947, a “Waiver of Restriction on Assessment and Collection of Tax Deficiency” was signed by Alfred L. Ochs as “former Pres.” with respect to proposed deficiencies for those years.
Deficiencies were assessed against Ochs Brothers, Incorporated, on March 3 and March 10, 1950. Later in March, plaintiffs’ position as regards the deficiencies was outlined in a letter to the Service. (A similar position had been taken by plaintiffs, beginning in January of 1949, in formal protests to and at intermittent conferences with the Service.) Primarily, they contended that the taxes were uncollectible because the statute of limitations for assessment of deficiencies had run, since (1) the corporation no longer existed after March 25, 1944, and thus could not execute extensions to the period of limitations, and (2) Donald and Alfred Ochs had never consented to such extensions as indvoidual trans *119 ferees of the corporate property after March 25, 1944. In response, the Service relied on the waivers of restriction on assessments and collections of deficiencies which required that the deficiency be paid and which only then allowed disputation of the assessment through the filing of a claim for refund.
Consistent with its position, the Service twice demanded payment in May 1950. On July 27, 1950, 30-day notices of transferee liability were sent to the brothers, individually. Early in August of that year, the Service caused to be served personally on one of the Ochs brothers a warrant for dis-traint directed to the corporation. Tax liens were also filed in the county and directed to Ochs Brothers, Incorporated.
Believing that the warrant and liens were effective, the president of the bank with which the Ochs brothers did business informed the brothers that the bank would not honor checks on the account or make any loans until the matter was settled. Consequently, the brothers conferred on August 16, 1950, with the Service in order to negotiate a basis for the payment of the assessments against Ochs Brothers, Incorporated, and also in reference to the personal tax liability of Alfred and Donald Ochs, individually, for the calendar years 1945 and 1946. The resultant settlement allowed certain overassessments which had been granted the brothers and their wives on 1945 and 1946 personal returns to be deducted from the corporation’s total deficiency. As the settlement contemplated, $17,465.95 was collected from each of the brothers for aggregated deficiencies assessed against Ochs Brothers, Incorporated, for the fiscal years ending on January 31, of 1943 through 1947. Plaintiffs are here asking for refund.
Initially, we must decide whether Ochs Brothers, Incorporated, even though its charter had expired under state law and its existence terminated, was taxable as a corporation within the meaning of section 3797(a) (3) of the Internal Kevenue Code of 1939[3] for the period covered by the deficiency assessments.
Whether an organization is to be taxed as a corporation ■under the Code is determined by Federal, not state, law. *120 Burk-Waggoner Oil Ass’n v. Hopkins, 269 U.S. 110 (1925). Section 3797(a)(3) provides: “The term ‘corporation’ includes associations * * A regulation [4] which covers the years in issue states:
If the conduct of the aifairs of a corporation continues after the expiration of its charter, or the termination of its existence, it becomes an association.
We consider this a reasonable interpretation of the Code by the Internal Eevenue Service.[5] The question remains whether, as shown by the facts in these cases, there is present the continued conduct “of the affairs of a corporation” after March 25, 1944 — the date the charter of Ochs Brothers, Incorporated, expired.
On February 11, 1948, all the outstanding stock of Ochs Brothers, Incorporated, was surrendered and canceled, and Alfred and Donald Ochs entered into a written partnership agreement. The latter was a written memorandum of a purported oral agreement to operate the business as equal partners after April 30, 1944. Also in February 1948, the capital and surplus accounts of the corporation were closed out retroactively and transferred to a new partnership capital account opened as of February 1, 1947. Partnership tax returns were first filed for the fiscal year ending January 31, 1948. A notice furnished the Service in June 1948 (“Employer’s Notice of Termination of Employment”) signed by Alfred L. Ochs, as “Partner,” indicated the corporation had been dissolved on January 31,1947.
The events above, apart from asserted retroactivity, including the December 1947 discovery of the charter expiration itself, took place subsequent to January 31, 1947. This date marks the end of the period for which deficiencies were assessed. Clearly, at least until that date, “the conduct of the affairs of” Ochs Brothers, Incorporated, was carried on in the same manner as prior to the date the charter expired, that is as a corporation. A more detailed presentation of facts relevant to this conclusion is found in findings 11 through 16. We only note further in summary that during the years in question corporate tax returns and social secu *121 rity returns were filed under the name of Ochs Brothers, Incorporated, annual stockholders’ and directors’ meetings were held, corporate stock was issued, and bank records remained in the name of Ochs Brothers, Incorporated.
Ochs Brothers, Incorporated, therefore, was an association at least through the fiscal years ending January 31, 1947, and properly taxed as a corporation. See Coast Carton Co. v. Commissioner, 149 F. 2d 739 (9th Cir. 1945), which reached the same result when dealing with comparable facts.
Plaintiffs next argue that since this organization was neither a de facto nor de jure corporation under state law, no one could have been authorized to sign waivers and consents to extension of the statute of limitations as described, supra. Applicable to this contention is this court’s discussion in Aldridge v. United States, 64 Ct. Cl. 424, 432 (1928), of the power of a Mississippi executrix of a deceased taxpayer to waive the running of the statute of limitations against an assessment:
It can not be contended that the power of Congress to confer the right [to waive the statute] can be taken away by a State statute * * *. To say that the right can be granted but the privilege of exercising it can be limited or taken away by a State statute or a decision of a State court would be in effect to destroy the right and thus nullify the act of Congress.
Given the Service’s power to tax an organization as a corporation after the termination of its corporate existence according to state law, it must follow that appropriate persons have authority to negotiate with the Service and sign consents and waivers on behalf of the organization.
Plaintiffs do not argue that the assessments against Ochs Brothers, Incorporated, were improper even assuming the authority of the brothers to sign waivers and consents. But they do argue that the method of collection of the tax from themselves as individuals, or, more accurately, transferees of Ochs Brothers, Incorporated, was improper. This assertion is bottomed on the fact that the Service did not follow the pocedure outlined in section 311(d) for assessing deficiencies against the transferee of a taxpayer. Implicit in reaching the point where this contention must be answered is that plaintiffs were in fact liable as transferees. Section *122 311 does not create any substantive liability; it is procedural only. Defendant’s substantive rights against a transferee are to be determined by state law. Commissioner v. Stern, 357 U.S. 39 (1958). Under Minnesota law, a stockholder receiving corporate capital in exchange for his stock is liable to existing creditors for whom no provision for payment was made. See Lebens v. Nelson, 148 Minn. 240, 181 N.W. 350 (1921).
Plaintiffs’ substantive liability is, therefore, clear. And, in answer to plaintiffs’ contention, it is equally clear that section 311(d) merely provides a specific procedure for transferee assessment; it is not the only method by which defendant may proceed against transferees. Leighton v. United States, 289 U.S. 506 (1933). What is essential is that the taxpayer at some point is allowed a judicial determination of his legal rights. See Phillips v. Commissioner, 283 U.S. 589 (1931). Plaintiffs’ presence here attests to their being given this opportunity.
On the merits, the record shows that the Service has actually taken no action specifically directed toward plaintiffs as individual transferees other than the sending of 30-day notices of transferee liability. Exigencies of business demanded that plaintiffs settle the Ochs Brothers, Incorporated, assessments. Further, plaintiffs, as transferees, owed this tax; and in conference with Service representatives they agreed to and subsequently did satisfy this debt. Certainly, on these facts, the Service cannot be said to have abused its discretion in collecting from plaintiffs. Thus, the tax was validly assessed against Ochs Brothers, Incorporated, and properly collected from Alfred and Donald Ochs, transferers of the corporate assets.

Cases Nos. §63-56 a/nd 365-56

Both parties agree that the remaining two cases depend for their resolution on the year in which Ochs Brothers, Incorporated, was liquidated and its assets distributed to the brothers for purposes of computing capital gains tax. Defendant assessed deficiencies against the individual taxpayers on the basis that they realized a long-term capital gain in the year 1947. Plaintiffs assert that no gain was realized *123 until 1948 and rely primarily on the fact that on February 11, 1948, all outstanding stock of Ochs Brothers, Incorporated, was surrendered and canceled.
Generally, the year in which gain is realized is that year when the assets of the corporation are received by the stockholder. When, as is exhibited in the cases before us, the transferees of the corporate assets have complete control over the corporation, the date of distribution will be the date such transferees manifest their intention to presently take the property as their own. See Gensinger v. Commissioner, 208 F. 2d 576 (9th Cir. 1953). The issue is one of fact to be ascertained from the entire record. Schiele v. United States, 78 Ct. Cl. 329 (1933).
Defendant contends that plaintiffs — as shown, inter alia, by tax and social security returns; the closing out of corporate capital stock and surplus accounts as of January 31, 1947; the reporting of salary from Ochs Brothers, Incorporated, only for the month of January 1947, while reporting a distributive share of the profits from the partnership fiscal year January 31, 1947 through January 31, 1948 on their personal returns — have manifested the intent that the corporation was liquidated and the property distributed in 1947.
However, the events relied on by defendant actually occurred subsequent to the year 1947. Plaintiffs did not even know that the corporate charter had expired until December 1947. It was on February 11,1948, that the outstanding stock of Ochs Brothers, Incorporated, was surrendered and canceled. And, it also was not until that date that plaintiffs entered into a written partnership agreement, although the terms of that agreement mentioned April 30, 1944, as its effective date.
We do not think a taxpayer should be able to fix the date of capital gain realization by, what might be called, a manifestation of retroactive intent. To allow such control in arranging tax consequences of transactions would hardly result in an accurate reflection of a taxpayer’s actual situation. For example, if such were allowed, could not plaintiffs urge that the purported effective date of the partnership agreement (April 30, 1944) was the date of liquidation? Admittedly, as of that date they did not realize the corpo *124 rate charter bad expired. But neither were they so informed as of January 31, 1947, the effective date of liquidation as manifested by the events upon which defendant relies.
In the Schiele case, supra, this court held that the effective date of book entries was not necessarily determinative of the date a liquidating dividend was received by the taxpayer. The Tax Court in Estate of Moore, P-H T.C. Memorandum Decisions par. 61,257 (1961), found January 14, 1957, the date when stock was actually transferred to the corporation and accepted for redemption, to be the date certain stock was redeemed. The effective date of the stock cancellation in Moore as reflected by the corporation’s books was May 31, 1956. However, the evidence showed these entries were in fact made after May 31, 1956 and, therefore, were not controlling. The Moore case clearly demonstrates that manifestations of retroactive intent cannot be used to fix the date when the taxpayer presently took the property as his own.
We find that on the evidence in its totality plaintiffs did not presently receive corporate property from liquidation until the year 1948.
For the reasons expressed above, plaintiffs’ claims for refunds in cases numbered 362-56 and 364-56 are denied with the petitions in these cases dismissed. Judgment will be entered for plaintiffs in cases numbered 363-56 and 365-56 in the amounts of $12,057.96 and $11,491.64, respectively, with interest as provided by law.
It is so ordered.
Davis, Judge; Domras, Judge; Laramore, Judge; and Whitaker, Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Bobert K. McConnaughey, and the briefs and argument of counsel, makes findings of fact as follows:
1. These four cases have been consolidated for trial.
Two of them (362-56 and 364-56) seek recovery of corporate income and excess profits taxes assessed against a corporation, Ochs Brothers, Incorporated, for the fiscal years ending on January 31, of each of the years 1943 through 1947. *125 By reason of circumstances hereafter described, these taxes were paid under protest in 1950 by the plaintiffs, Alfred L. Ochs and Donald F. Ochs, who had been the owners of all the stock of the corporation and who now seek to recover the amounts so paid.
The other two cases seek recovery of individual taxes for the calendar year 1947, assessed against and paid by Alfred L. Ochs and his wife, Yerna L. (363-56), and Donald F. Ochs, now deceased, and his wife, Boberta (365-56). The amounts for which recovery is sought were assessed for 1947 on the theory that, on January 31, 1947, Ochs Brothers, Incorporated, was liquidated, and its assets were distributed to Alfred Ochs and Donald Ochs, who thereby realized a long-term capital gain in 1947. The plaintiffs contend there was no distribution of corporate assets to them on January 31, 1947, and, accordingly, that they realized no gain in that year from that source.
2.The questions in contest here turn upon controversial circumstances described in findings 18 through 43 that are appurtenant to certain basic facts summarized in findings 3 through 16, as to which apparently there is no substantial disagreement.

Findings Bash to All Four Gases

3. (a) In each case, timely claims for refund were made, and these suits were timely filed after rejection of such claims.
(b) The plaintiffs are citizens of the United States, reside at Faribault, Minnesota, and have borne true allegiance to the Government of the United States.
(c) Boberta Ochs, plaintiff in causes numbered 36N56 and 365-56, is the surviving wife and the duly qualified, appointed, and acting Executrix of the estate of Donald F. Ochs, deceased.
4. For many years, members of the Ochs family have conducted a mercantile business in Faribault, Minnesota.
5. On March 24, 1914, the Ochs mercantile business was incorporated as The Albert Ochs Mercantile Company, Inc., under the laws of Minnesota, for a term of 30 years. The corporate name was changed to Ochs Brothers, Incorporated, on January 31,1928.
*126 6. In the spring of 1944, Alfred and Donald Ochs, sons of one of the founders, acquired the interest of their sister, Celia. Thereafter they owned all of the shares of Ochs Brothers, Incorporated, except one issued to Donald’s wife, Roberta, to qualify her to act as one of the three directors required by state law. Alfred and Donald were managers of the business and its chief executive officers. They devoted their full time to it, and during all times pertinent to these cases, were exclusive owners of the enterprise.
7. The corporation, Ochs Brothers, Incorporated, kept its accounts on the accrual basis and adopted a fiscal year ending January 31st as its accrual accounting period.
8. On March 25, 1944, the corporate charter of Ochs Brothers, Incorporated, expired. It was never renewed or extended.
9. Section 309.59. of Revised Minnesota Statutes of 1945 provides:
Every corporation whose existence terminates by limitation, forfeiture, or otherwise, shall continue for three years thereafter for the purpose of prosecuting and defending actions, closing its affairs, disposing of its property and dividing its capital, and for no other purpose.
10. Neither Alfred nor Donald Ochs realized the corporate charter had expired until December 1947, when its expiration was discovered by P. J. Coffey, who had been employed in October 1947, purportedly by the corporation, to represent it in a controversy with the Internal Revenue Service concerning proposed deficiencies aggregating $34,465.95 in the tax for the fiscal years ending on January 31, 1943 1944, and 1945, reported in its corporate returns filed fr»*those years.
These deficiencies had been proposed in a report of a revenue agent dated March 3, 1947, following an audit of tbe returns.
11. During the period of more than 3 years, from March 25, 1944, when the corporate charter expired, until after December 1947, when its expiration was discovered, the business was carried on in the same manner as it had been carried on before the charter expired.
*127 (a) Annual stockholders’ and directors’ meetings were held, the last in February 1947.
(b) Stock was issued to Alfred and Donald, as follows:

Date Alfred Donald

July 5, 1944_ . 80 shares 80 shares
January 31, 1945. . 60 shares 60 shares
January 31, 1946. . 80 shares 80 shares
January 31, 1947. . 80 shares 80 shares
(c) Income tax returns, both Federal and state, for the fiscal years ending on January 31 of 1945, 1946, and 1947, were filed on corporate forms, were signed by persons purporting to act as corporate officers, and bore the corporate seal.[6]
(d) The taxes shown as due on the corporate tax returns filed in the name of Ochs Brothers, Incorporated, for each of the fiscal years ending on January 31, from 1943 through 1947, were timely paid.
(e) Social security returns and Minnesota unemployment fund returns were filed under the name of Ochs Brothers, Incorporated, until the end of the first quarter of 1948.
(f) No change was made in the method or manner in which the books of the business were kept until sometime in February of 1948 when the capital stock and surplus accounts of the corporate books were closed out retroactively by entries dated February 28,1947, and transferred to a partnership capital account opened as of February 1,1947.
(g) The bank records of the Ochs mercantile enterprise remained in the name of Ochs Brothers, Incorporated, through and beyond the calendar year 1947. Until June 7, 1948, it used checks bearing the name “Ochs Brothers, Inc.”
Apparently as a result of inadvertence on the part of the bank, the signature cards for the account of the Ochs mercantile enterprise and some of the bank’s ledger sheets for the account still bore the name Ochs Brothers, Incorporated, as late as August 1950, although the bank had been informed long before that date of the change in the legal form of the enterprise.
(h) In all respects the business was continuously conducted after March 25,1944, and until after December 1947, *128 without any change or interruption, in the same manner as it had been conducted before the expiration of the corporate charter, and without any notification to the public, to creditors or to the Government, of any change in the legal form of its organization.
12. On February 11, 1948, all the outstanding stock of Ochs Brothers, Incorporated, was surrendered and canceled, and Alfred and Donald Ochs entered into a written partnership agreement at the suggestion of their tax counsel, P. J. Coffey. That agreement, by its terms, purported to be a written memorandum of an oral agreement to operate the business as equal partners after April 30,1944.
13. As indicated in finding 11(f), the capital and surplus accounts of Ochs Brothers, Incorporated, were closed out retroactively in February of 1948, as of February 28, 1947, and both accounts were transferred to a new partnership capital account opened as of February 1,1947.
14. On March 6, 1948, Alfred and Donald Ochs filed with the Clerk of the Court, Eice County, Faribault, Minnesota, a certificate of trade name giving public notice that the business conducted under the name of Ochs Brothers is a general merchandise business, and that the sole parties with an interest therein are Alfred and Donald Ochs.
15. For the fiscal year ending January 31, 1948, partnership tax returns were filed, although the enterprise had been carried on throughout that year in the name of Ochs Brothers, Incorporated, in exactly the same way as it had been carried on in prior years for which corporate form returns had been filed.
16. On June 17, 1948, an Employer’s Notice of Termination of Employment, signed by Alfred L. Ochs, as “Partner,” was filed with the Collector of Internal Eevenue. This notice identified Ochs Brothers, Incorporated, as the “Employer,” stated as the reason for termination “Corporation dissolved,” fixed “Jan. 31 ’47” as the “Date Change Took Place,” and identified “Ochs Brothers” as the “New Owner.”
17. Against the background of the facts summarized in findings 2 through 16, the facts hereafter stated in findings 18 through 43 raise the questions for decision in this case.

*129
Findings Primarily Pertinent to Oases 362-66 and 364-66

18. A revenue agent’s report dated March 3, 1947, made after audit of the corporate form returns filed by the Ochs enterprise for the fiscal years ending on January 31, of 1943, 1944, and 1945, proposed deficiencies of $34,465.95, mainly as a result of disallowance by the revenue agent of deductions of certain officers’ salaries.
19. (a) On or about January 9,1948, an amended protest dated January 6,1948, was filed hi the name of Ochs Brothers, Incorporated. It was prepared by P. J. Coffey, who was designated as attorney for Ochs Brothers, Incorporated, in a power of attorney dated January 9, 1948, and signed in the name of Ochs Brothers, Incorporated, by Donald F. Ochs, without any specific identification of the capacity in which he signed. The amended protest itself was likewise signed in the name of Ochs Brothers, Incorporated, by Donald F. Ochs who, on January 9, 1948, swore before a notary public that “he is the Secretary-Treasurer of Ochs Brothers, Incorporated, above-named, and as such is duly authorized to execute this protest; * *
This amended protest, in addition to protesting the amount of the proposed deficiencies, stated:
$ ^ ‡ $
a. That the Albert Ochs Mercantile Company, Incorporated, was organized under the laws of Minnesota on March 25,1914, for a period of thirty years. On January 30, 1928, a certificate of amendment was filed with the Department of State, State of Minnesota, changing the name of the corporation to Ochs Brothers, Incorporated.
b. That on March 25, 1944, the corporate charter of Ochs Brothers, Incorporated, was allowed to expire and has never been renewed.
c. That from and after March 25, 1944, the said corporation ceased to exist, and that from said date the business formerly operated by the corporation has been operated by a partnership.
(b) In April 1949, three forms 872, “Consent Fixing Period of Limitation Upon Assessment of Income and Profits Tax,” were executed in the name of Ochs Brothers, Incorporated, for the fiscal years ending on January 31, of 1943,1944, *130 and 1945. The date fixed was June 30,1950. These consents bear the corporate seal and were signed “Alfred L. Ochs, former President.” [7]
20. (a) Conferences concerning the proposed deficiencies for 1943,1944, and 1945, were held on July 8 and on October 25 and 26,1949, attended by officials of the Internal Revenue Service and by Mr. Coffey, on behalf of the Ochs enterprise. The officials of the Internal Revenue Service who attended the conference were aware that the charter had expired on March 25, 1944, about 2 months after the beginning of the second of the 3 fiscal years covered by the returns under consideration. As a result of these conferences, part of the amount claimed as deduction for officers’ salaries which the revenue agent had proposed to disallow were allowed, but the revenue agent was sustained on the proposal that the business should be taxed as a corporation.
(b) On November 10, 1949, a form 874, “Waiver of Restriction on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessments,” with respect to the deficiencies proposed for 1943, 1944, and 1945, was signed on *131 behalf of Ochs Brothers, Incorporated, by Alfred L. Ochs. This waiver was received by the Internal Revenue Agent in Charge in St. Paul, on November 14, 1949. Mr. Ochs’ signature is accompanied by no express indication of the capacity in which he signed this waiver.
21. (a) A revenue agent’s report dated January 20, 1950, made after audit of the corporate form returns filed in the name of Ochs Brothers, Incorporated, for the fiscal years ending January 31, 1946, and January 31, 1947, proposed deficiencies for those years totaling $19,320.35, mainly as a result of the agent’s disallowance as deductions of certain officers’ salaries and travel expenses.
(b) On J anuary 17,1950, a form 870, “Waiver of Restrictions on Assessment and Collection of Tax Deficiency,” with respect to the deficiencies proposed for 1946 and 1947, was executed in the name of Ochs Brothers, Incorporated, and signed by Alfred L. Ochs as “former Pres.” This waiver was received in the office of the Internal Revenue Agent in Charge in St. Paul, on January 20,1950.
22. No written protest was made to the report of J anuary 20, 1950, but, at a conference attended by the Examining Agent, the Ochs brothers, and P. J. Coffey, their attorney, the computations of net income and of the deficiencies proposed in the report were checked and agreed to.
23. On March 3, 1950, and March 10, 1950, deficiencies were assessed against Ochs Brothers, Incorporated.
24. No deficiencies for the period between March 25,1944, and January 31, 1945, or for fiscal years ending on January 31 of 1946 or 1947, were ever assessed against Alfred L. Ochs or Donald F. Ochs, as partners doing business under the trade name of “Ochs Brothers, Incorporated.”
On the contrary, officials of the Internal Revenue Service declined to adjust the amounts of tax payable in respect of the operation of the business for those periods to a basis that would reflect its operation during such periods as a partnership.
25. On March 20, 1950, P. J. Coffey, writing on behalf of “Ochs Brothers, Inc.,” sent to the Collector of Internal Revenue at St. Paid, pursuant to the latter’s request, duplicate copies of a statement, on form 7658, of the taxes due from *132 Ochs Brothers, Incorporated, for the fiscal years ended January 31,1943, through 1947, together with what he described as a “statement of facts with reference to ‘Consents Fixing Period of Limitation Upon Assessment of Income and Profits Tax.’ ”
The letter includes the following statement of the position then asserted on behalf of Ochs Brothers, Incorporated, with reference to the effect of the expiration of its charter on its tax liability:
*****
You are advised that the Minnesota charter of Ochs Brothers, Incorporated was allowed to expire on March 25, 1944 and that said charter has never been renewed; that notice of said expiration was given to the Office of the Commissioner of Internal Revenue on or about the 9th day of January, 1948.
That on March 25,1944, Donald F. Ochs and Alfred L. Ochs became transferees of said corporation.
That Section 300.59, Minnesota Statutes for 1945, reads as follows:
“Continuance to close affairs
“Every corporation whose existence terminates by limitation, forfeiture, or otherwise, shall continue for three years thereafter for the purpose of prosecuting and defending actions, closing its affairs, disposing of its property, and dividing its capital, but for no other purpose.”
That the office of the Commissioner of Internal Revenue requested and received from Ochs Brothers, Incorporated, “Consent Fixing Period of Limitation Upon Assessment of Income and Profits Tax,” on or about April 5,1949 for the fiscal years ended January 31,1943, 1944, and 1945, which said Consents were all signed as follows, with corporate seal affixed:
Ochs Brothers, Lstcorporated,
Alfred L. Ochs,

Former President.

That neither Alfred L. Ochs nor Donald F. Ochs, transferees of Ochs Brothers, Incorporated, as such, have ever signed or submitted any “Consent Fixing Period of Limitation Upon Assessment of Income and Profits Tax” for any of said years.
That from March 25,1944 to January 31,1947, that is, for the fiscal years ended January 31, 1945, 1946 and 1947, corporation income and declared value excess *133 profits tax returns and corporation excess profits tax returns were filed and tax paid thereon through error.
That the Bevenue Agent in his review of said years ended January 31,1945,1946, and 1947 treated the business as an “association” taxable as a corporation.
In view of the foregoing facts, it is believed that the statute of limitation has run against the assessment and collection of any of said tax from any corporation, association, or individual, and for the following reasons:
(1) The charter of Ochs Brothers, Incorporated, expired on March 25, 1944, and its “continuance to close affairs” lapsed March 25, 1947, and from and after March 25,1944 the said corporation has had no assets of any kind with which to pay any tax.
(2) That the office of the Commissioner of Internal Bevenue was notified on or about January 9, 1948 that said charter had expired on March 25,1944.
(3) That Donald F. Ochs and Alfred L. Ochs, as transferees, of said corporation were never requested to and have never submitted any “Consent Fixing Period of Limitation Upon Assessment of Income and Profits Tax,” and, therefore, never extended the statute, and that the statute has run as against said individuals.
(4) That whereas the said Donald F. Ochs and Alfred L. Ochs were transferees of the said corporation, it cannot be held that they were transferees of the so-called “association.”
26. On April 28, 1950, E. I. McLarney, Deputy Commissioner, Office of Commissioner of Internal Bevenue, in a letter addressed to Ochs Brothers, Incorporated, stated the Government’s response to the views expressed by Mr. Coffey in the letter quoted in finding 25. It is to be noted that this response relies upon the waivers on forms 874 and 870, submitted November 14, 1949 (as described in finding 20b) and January 20, 1950 (as described in finding 21b), as effective to bind, the corporation and to preclude consideration of Mr. Coffey’s exception to the taxes until after the taxes were paid. The text of Mr. McLarney’s letter is as follows:
Beference is made to the letter dated March 20,1950, written in your behalf by P. J. Coffey, 1214 Northwestern Bank Building, Minneapolis, Minnesota.
The letter relates to a determination of your income tax returns for the taxable years ended January 31, 1943 to 1947, inclusive, as set forth in a report of examination and field conference report, for the taxable years *134 1943, 1944, and 1945, dated March 3, 1947 and July 8, 1949, respectively, and report of examination, for the taxable years 1946 and 1947, dated January 20, 1950, prepared in the office of the Internal Revenue Agent in Charge at St. Paul, Minnesota.
The field conference report for 1943, 1944, and 1945 discloses deficiencies in income and excess profits tax in the total amount of $12,430.84 and, an overassessment in the amount of $274.41 and the report of examination for 1946 and 1947 discloses deficiencies in income and excess profits tax in the total amount of $18,320.35. In respect to these deficiencies there were executed and filed, under date of November 14, 1949 for 1943, 1944 and 1945 and under date of January 20, 1950 for 1946 and 1947, and in accordance with the provisions of section 272(d) of the Internal Revenue Code, waivers of the restrictions provided in section 272(a) of the Code, consenting to the immediate assessment and collection of the deficiencies. The deficiencies for the earlier years were assessed March 3, 1950 and for the later years March 10,1950, dates prior to receipt in this office of the letter of March 20, 1950.
In the letter from Mr. Coffey exception is taken to the assessment of the deficiencies against you.
Section 29.272-1(5) of Regulations 111 provides that, after a waiver filed by a taxpayer under section 272(d) of the Code has been acted upon by the Commissioner and the assessment has been made in accordance with its terms, the waiver cannot be withdrawn. Inasmuch as the records indicate that the waivers were voluntarily executed and filed by you, and as the Commissioner has acted upon such waivers by assessing the tax in accordance with its terms, no change may be made in the assessment list on the basis of the data submitted by Mr. Coffey. It will be necessary, therefore, for you to pay the deficiencies, together with interest thereon, on receipt of notice and demand therefor from the collector of internal revenue.
After payment of the deficiencies and interest, it is your privilege to file claims for refund of any portion thereof which is considered to have been overpaid. The claims should be made on Form 843, and should be filed with the collector of internal revenue for the district in which the returns were filed. Such claims must set forth in detail and under oath each ground upon which a refund is claimed, and facts sufficient to apprise the Commissioner of the exact basis thereof.
*135 When the taxes have been paid, and when proper claims for refund are filed with the collector, such claims will be forwarded by the collector to the office of the Internal Revenue Agent in Charge, St. Paul, Minnesota, for consideration and appropriate disposition. Your returns for the years involved have been forwarded to the internal revenue agent in charge in order that they may be available to him on receipt by him from the collector of any claims for refund properly filed as herein set forth.
Copies of this letter have been furnished the collector and the internal revenue agent in charge.
27. On May 5, 1950, George O. Lethert, Chief, Income Tax Division, Office of the Collector, St. Paul, writing for E. F. Kelm, Collector, addressed to Mr. Coffey an additional response to Mr. Coffey’s letter of March 20, 1950 (finding 25). "
It is to be noted that this reply also refers to the waiver on form 874, filed November 14,1949, and the waiver on form 870, filed January 20,1950, as “voluntarily executed and filed by the taxpayer” and ignores Mr. Coffey’s claim that the taxpayer (Ochs Brothers, Incorporated) no longer exists and was not in existence on the dates when the waivers were signed.
The text of Mr. Lethert’s letter is as follows:
Reference is made to the letter you directed to this office, under date of March 20,1950, with reference to the deficiencies in tax entered against the above company, covering the fiscal years ended January 31, 1943, 1944, 1945, .1946 and 1947, also for the calendar year 1944.
This matter was referred to the Bureau at Washington, and a reply has now been received, reading as follows.
“The deficiencies for 1943,1944 and 1945 were assessed on March 3,1950, under authority of an agreement, Form 874, voluntarily executed and filed by the taxpayer on November 14, 1949. The deficiencies for 1946 and 1947 were assessed on March 10, 1950, under authority of an agreement, Form 870, voluntarily executed and filed by the taxpayer January 20, 1950. You state that demand notices were issued upon receipt of the lists bearing the deficiencies.”
The Bureau’s reply further advises that, in view of the above circumstances, it will be necessary for this corporation to make full payment of the deficiencies assessed, together with interest. After payment of these *136 assessments, it is their privilege to file Claims for Refund covering any portion thereof which they consider to be an overpayment.
28. (a) Demands for payment of the taxes assessed in the name of Ochs Brothers, Incorporated, for the fiscal years ending on January 31 of 1943, 1944, 1945, 1946, and 1947 were made on May 8, 1950, and on or about May 29, 1950. These demands were addressed to Ochs Brothers, Incorporated.
(b) The demands made on May 8, 1950, state that if full payment is not received, within 10 days, the law provides for issuance of a warrant of distraint.
(c) The demands made on May 29, 1950, state that a warrant of distraint had been issued and was being helcl in the office of the Field Division Chief of the Internal Revenue Service at Mankato, Minnesota.
29. On July 27, 1950, 30-day notices of transferee liability for the taxes claimed, to be owing by Ochs Brothers, Incorporated, were sent to Alfred and Donald Ochs, individually, and were received by them.
30. (a) Early in August of 1950, T. M. Casey, now deceased, who was then Division Chief of the Internal Revenue Office at Mankato, and Frank Hensler, then Assistant Chief Deputy in the Collector’s office, and. Casey’s superior, went to Faribault for the purpose of serving a warrant for distraint..
(b) Neither the warrant nor the return of its service is in the record, but it seems clear from all the evidence that it was directed to the corporation “Ochs Brothers, Incorporated” and that it was served personally on one of the Ochs brothers.
(c) Sometime in the course of Mr. Casey’s and Mr. Hensler’s stay in Faribault, they went to the courthouse and filed tax liens, also directed to Ochs Brothers, Incorporated, with the Register of Deeds of Rice County, Minnesota. Alfred Ochs testified that he did not learn about the filing of the liens until later, and, then learned of it from the credit bureau.
(d) After the warrant was served, Casey and Hensler, in company with both Ochs brothers, went to the office of Lucius *137 Smith, ,an attorney in Faribault who represented the Ochs brothers. There the matter was further discussed.
(e) Eventually Mr. Smith, one of the Ochs brothers, and Messrs. Casey and Hensler went to the bank where the account of the Ochs mercantile enterprise was kept. Mr. Casey asked to see the bank’s records of the account. The records were brought forth. The signature cards and some of the ledgers were still in the name of Ochs Brothers, Incorporated. Mr. Peavey, the president of the bank, was visibly disturbed to find that this was so. Mr. Hensler, testifying, said “the banker finally admitted that somebody made a slip and that the account should have been changed.”
(f) It is clear from the record that the fact that the corporate charter had expired was a primary topic of discussion during Mr. Casey’s and Mr. Hensler’s stay in Faribault, and that they were repeatedly advised by the Ochs brothers, and by Mr. Smith, of the Ochs brothers’ claim that the corporation no longer existed.
(g) On the basis of the whole record, there is no persuasive evidence that the representatives of the Internal Revenue Service made any threats that property owned by the Ochs brothers personally, or as partners, would or could be seized, as such, under the warrant or the liens they had. They do, however, appear to have persisted, throughout their visit, in a firm disbelief of the representations made to them that the corporation no longer existed, and to have served the warrant and filed the liens directed to the corporation (which was all they had) with the unshaken conviction that these processes would be fully effective against the property then employed in the Ochs mercantile business, including the bank account and the store’s stock of merchandise.
Their evident confidence in the effectiveness of the warrant and the liens appears to have been communicated to the Ochs brothers and to the president of the bank, and affected their subsequent actions.
31. (a) The president of the bank was sufficiently persuaded of the probable immediate effectiveness of the liens that he informed the Ochs brothers, after the representatives of the Internal Revenue Service had left, that “we can’t pay *138 any checks on that account or we can’t make any loan until this thing is settled.”
(b) Despite advice by Mr. Coffey to pay no attention to the warrant for distraint and the liens, the Ochs brothers concluded that if, as it then appeared to them, they could not get credit from the bank, they could not continue to operate their business.
(c) Accordingly, they instructed Mr. Coffey, before August 16,1950, to negotiate with the Internal Eevenue Service a basis for payment of the assessments that had been made against Ochs Brothers, Incorporated, for the fiscal years ending on January 31 of the years 1943 through 1947.
32. (a) Shortly after August 16, 1950, a conference was held between Mr. Coffey and T. H. Feig, Kevenue Agent in Charge, to consider settlement of the tax liability of Ochs Brothers, Incorporated, through the fiscal year ending on January 31 of 1947, and also the individual liability of Alfred and Donald Ochs for the calendar years 1945 and 1946.
(b) The result of these conferences is evident from a memorandum from Mr. Feig dated August 16,1950, and three statements of tax liability dated September 15, 1950, that were sent — one to Ochs Brothers, Incorporated, and one to each of Ochs brothers personally. The net effect of the proposed settlement, as expressed in Mr. Feig’s memorandum, was that overassessments totaling $10,026.03 would be allowed to Alfred and Donald Ochs and their wives, for 1945 and 1946, on the understanding that:
(1) the amount of these overassessments would be applied to the deficiency of the corporation for the fiscal years 1943 to 1946., inclusive, aggregating $23,066.19, plus interest, and the corporation would pay the balance of $13,040.16 of tax, plus interest.
(2) there should be a clear understanding that the taxpayer would not file or prosecute a claim for refund for the corporation for the fiscal year 1947 for which year the deficiency was paid.
(c) On September 14, 1950, a form 873, “Acceptance of Proposed Overassessment,” for fhe fiscal year ending January 31, 1947, was executed in the name of Ochs Brothers, Incorporated, and signed by Alfred L. Ochs and Donald F. *139 Ochs. There is no expressed indication of the capacity in which they signed this document.
33. Aggregate deficiencies in income tax assessed against Ochs Brothers, Incorporated, for the fiscal years ending on January 31 of the years 1943 through 1947, were collected from Alfred and Donald Ochs, over their protest, in equal shares of $17,465.95 each.

Findings Applicable Primarily to Gases 368-56 and 365-56

34. Alfred L. Ochs and his wife, Yerna L., reside at Fari-bault, Minnesota. They filed a joint Federal income tax return for 1947 on a calendar year basis.
35. Donald F. Ochs, now deceased, and his wife, Roberta, were, in 1947, residents of Faribault, Minnesota. They filed a joint Federal income tax return for 1947 on a calendar year basis.
36. On their individual income tax returns for the calendar year 1947, prepared after the execution on February 11, 1948, of the partnership agreement described in finding 12, Alfred L. and Donald F. Ochs each reported $1,650 salary from Ochs Brothers, Incorporated, representing salary for the month of January 1947, and no income from the operations of the business during the subsequent months of 1947.
37. Alfred L. and Donald F. Ochs each reported, in their income tax returns for the calendar year 1948, their distributive shares of profits of the Ochs Brothers enterprise for the fiscal year of that enterprise, January 31, 1947, to January 31, 1948, for which the business filed a partnership return. The defendant agrees that these amounts were properly included in their returns for the calendar year 1948.
38. Alfred L. and Donald F. Ochs received all the assets of Ochs Brothers, Incorporated, upon its liquidation.
39. As appears in finding 11, no change in the manner of conducting the Ochs mercantile enterprise occurred on January 31, 1947, or at any other time until after the discovery in December of 1947, that the charter of the corporation had. expired on March 25,1944, and the entries made in the books of the enterprise closing out the capital stock and surplus accounts of the corporation as of February 28, 1947, and *140 opening the capital account of the partnership were made, retroactively, in February of 1948.
40. Eevenue Agent’s reports dated November 30, 1950, proposed deficiencies of $27,450.01 against Alfred L. Ochs and his wife, .and $27,333.50 against DonalcL F. Ochs and his wife, based in part, in each case on the inclusion of a long-term capital gain from the sale or exchange of capital assets on the theory that the corporation, Ochs Brothers, Incorporated, had been liquidated on January 31, 1947, and that its assets had been distributed on that date to the Ochs brothers, who continued the enterprise thereafter as partners.
41. (a) On April 12 and July 11, 1951, conferences were held concerning the proposed deficiencies described in finding 40. At these conferences, Mr. Coffey, representing Alfred L. and Donald F. Ochs, was still persisting in his position that the corporation had been liquidated on March 25, 1944, and not on January 31,1947.
The representatives of the Internal Eevenue Service did not go along with this theory of Mr. Coffey’s. Instead, the agent was sustained, not only on his proposal to include some additional salary income, but also on his basic proposal that the Ochs brothers should be taxed on the basis that the corporation had been liquidated January 31,1947, and its assets had been transferred to them on that date. The agent was reversed, however, on his proposal to include goodwill as an element of the value of the property which the Government claimed was so transferred, in 1947.
As a result of the conferences, the deficiencies asserted in the agent’s report were reduced to $9,958.50, with interest of $2,099.46, in the case of Alfred L. and Verna L. Ochs, and to $9,490.76, with accured interest of $2,000.88, in the case of Donald F. and Eoberta Ochs.
(b) On August 20, 1951, Alfred. L. and Donald F. Ochs each signed a form 870, “Waiver of Eestrictions on Assessment and Collection of Deficiency in Tax,” in respect of the proposed reduced deficiencies described in finding 41(a).
42. The adjusted deficiencies worked out at the conference were assessed.
43. On September 28, 1951, Donald F. and Eoberta Ochs paid the deficiency of $11,491.64 ($9,490.76, plus interest of *141 $2,000.88) .assessed against them, and on October 5, 1951, Alfred L. and Verna L. Ocbs paid the deficiency of $12,057.96 ($9,948.50, pins interest of $2,099.46) assessed against them.
CONCLUSION OE LAW
Upon the foregoing findings of fact which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs in cases numbered 362-56 and 364-56 are not entitled to recover and the petitions in these cases are therefore dismissed.
The court further concludes as a matter of law that plaintiffs in cases numbered 363-56 and 365-56 are entitled to recover and it is therefore adjudged and ordered that the plaintiffs Alfred L. Ochs and wife, Verna L. Ochs (No. 363-56) recover of and from the United States the sum of twelve thousand fifty-seven dollars and ninety-six cents ($12,057.96), and that plaintiff Roberta Ochs (No. 365-56) recover of and from the United States the sum of eleven thousand four hundred ninety-one dollars and sixty-four cents ($11,491.64), with interest thereon as provided by law in both cases.

 Roberta Ocbs, plaintiff In eases numbered 364-56 and 365-56, Is tbe surviving wife and tbe executrix of tbe estate of Donald F. Ocbs.

 See finding 9.

 26 U.S.C. (I.R.C. 1939) § 3797(a)(3) (1952 Ed.).

 Treas. Reg. 111, § 29.3797-2.

 To the same effect see Coast Carton Co. v. Commissioner, 149 F. 2d 739, 741 (9th Cir. 1945).

 As Indicated in finding 15, partnership tax returns, both Federal and state, were filed for the fiscal year ending January 31, 1948.

 There is no very persuasive affirmative proof that a similar form 872 for the fiscal year ending January 81, 1946, was executed at that time or, indeed, at any other time.
None of the three copies of such a form, which customarily are executed, could be found. In April 1949, when the forms 872 for 1943, 1944, and 1945, described in finding 19(b), were executed, the proposed deficiencies for those years were being discussed together on the basis of the revenue agent’s report of March 3, 1947. No revenue agent’s report with respect to 1946 (or 1947) had yet been made. In these circumstances, it seems likely that if any consent was requested or given in respect of 1946, it was not requested or given simultaneously with those covering the earlier years, as part of one transaction.
Revenue Agent Clark stated that a form 872 for 1946 was executed and was attached, by him, to the return for that year (which is also missing from the record). His testimony appears, however, to rest, not upon a clear and specific present recollection of receiving such a waiver for 1946 and attaching it to the return for that year, but upon a reasoned conclusion, based upon common practice, that a jeopardy assessment would have been made if such a form had not been executed in due time.
Mr. Coffey, testifying, not from present recollection but by deduction from the fact that no copy of a form 872 for 1946 could be found among the records he kept of such forms, says none was ever executed.
There is no evidence, however, that, in the course of administrative consideration of these taxes, Mr. Coffey ever raised the lack of such a consent for 1946 as a basis for relieving the plaintiffs from the tax for that year. In view of his diligence and ingenuity in discovering and asserting objections to these taxes, it seems reasonable to conclude that, if the time for assessment of the 1946 tax had been permitted to lapse without any evidence of purported consent to extension, he would have raised the point at the time.