Clinton B. SNYDER, Plaintiff,

v.

STATE–WIDE PROPERTIES, INC., and Maurice H. Kamm, Defendants,

and

AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO et al., Third-Party Defendants.

No. 57 C 1906.

United States District Court
N. D. Illinois, E. D.
Nov. 20, 1964.

734

Eli E. Fink, Chicago, Ill., for plaintiff.

Harlan L. Hackbert, Chicago, Ill., for defendant, Maurice H. Kamm.

Kirkland, Ellis, Hodson, Chaffetz & Masters, Chicago, Ill., for American National and Trust Co.; Kelly, Kelly & Kelly, Chicago, Ill., for James E. Glynn; Manuel J. Finkel, Chicago, Ill., for Irving Nathan; John J. Faissler, Chicago, Ill., for Sonnenschein, Lautmann, Levinson, Rieser, Carlin & Nath, Chicago, Ill., law firm and its members, all third party defendants.

ROBSON, District Judge.

Third party supplementary proceedings have been filed in this action by plaintiff, Clinton B. Snyder, to recover from former preferred stockholders (one of whom also held common stock) funds theretofore distributed to them by defendant State-Wide Properties, Inc. These stockholders filed motions for summary judgment and plaintiff filed a countermotion against them for summary judgment. The stockholders who filed the motions and the dates of filing are as follows:

(1) American National Bank and Trust Company, the transfer agent for State-Wide, filed on January 30, 1963.

(2) Irving Nathan, auditor for State-Wide, filed on January 30, 1963.

(3) Sonnenschein, Lautmann, Levinson, Rieser, Carlin and Nath; and David Levinson, Leo J. Carlin,

Bernard Nath, Louis P. Haller, Roger S. Bloch, Ben Rothbaum, Thomas Carlin, Samuel R. Rosenthal, Charles D. Satinover, Jerome S. Weiss, Frank C. Bernard, John J. Faissler, and Abraham Fishman, filed on January 30, 1963. (They are known as the Sonnenschein group, derived from former members of the firm, which had been counsel for State-Wide from the time of its incorporation and in this cause through 1959.)

(4) James E. Glynn, a director of State-Wide who held 40 shares of preferred and two shares of common stock, filed on February 15, 1963.

*All* motions assert that under Rule 56 there is no genuine issue of fact to be resolved.

Plaintiff, in his effort to satisfy his July, 1962, $152,800 judgment against State-Wide, moved for and procured judgments against these third party defendants in these amounts:

| | |
|---|---|
| American National Bank and Trust Company | $ 2,500.00 |
| Sonnenschein group | 20,000.00 |
| Irving Nathan | 7,000.00 |
| James E. Glynn | 4,107.89 |

The Glynn judgment represents $4,000 covering the 40 shares of preferred stock and two shares of common stock distributions.

The court concludes that:

[1]   (1) There is no genuine issue of fact, only a question of the proper inferences to be drawn from the facts below outlined; therefore it is proper for the court to pass upon the respective motions for summary judgment;

(2) Those facts disclose a company with a single large asset, the real estate which it was contemplated would be sold and the company dissolved;

(3) The events hereinafter stated transpired over many months pending the sale of the building and the distribution of the company's assets;

(4) The payment of the preferred stockholders was a part of the dissolution and did not constitute a purchase of the stock, but a retirement;

(5) Plaintiff, as a creditor with a suit pending at the time of the dissolution, has a superior right to payment over the preferred stockholders in the distribution of the liquidating company's assets, and

(6) Plaintiff's motion for summary judgment should be granted and the several motions of the preferred stockholders for summary judgment denied.

The crux of this controversy seems to be the proper inference to be drawn from the fact that the preferred stock held by these third parties was turned in to the company in *January* of 1959, following the June 20, 1958, resolution covering the company's plan of liquidation, but months *prior* to the actual cancellation of the preferred stock certificates and legal dissolution of the company at the end of June, 1959.

These preferred stockholders maintain that the turning in of the stock, and its much later cancellation, constituted two transactions, the January one being a *purchase* of the stock, as authorized by the company's Articles of Incorporation, Article Fourth, and 8 Del.C. Sections 160 and 243 of the Delaware Corporation Law, and *not a redemption*. Therefore, inasmuch as the company was *solvent* at the time of the purchase, having sufficient assets to pay plaintiff and all other debts, the corporate assets cannot be considered a trust fund so as to make the preferred stockholders liable many years

later from the judgment of plaintiff creditor. Defendants contend the purchased preferred stock became treasury stock.

On the other hand, plaintiff maintains that the January and February, 1959, transactions were all a part of the company's liquidation and the corporate assets did constitute a trust fund for the creditors. He further points to evidence that there was no preferred stock in the treasury according to the auditor's report.

The American National Bank and Trust Company additionally contends it held its 25 shares of preferred stock pursuant to oral agreement, from 1955 to February, 1959, as *security only* for its services for those years as Registered Indenture Trustee. It denied having received payment on these shares either as dividends or in liquidation but said payments were made pursuant to agreement, upon the company's accrued debt, and credits were made upon that debt to the bank. It had received previous payment of $782.95, and the amount due it as of February 9, 1959, was $5,198.97, for which it agreed in early February to accept $5,000 in full payment. This is corroborated, it claims, by writings dated November 7, 1958, February 3, 1959, February 6, 1959, and February 9, 1959. It also points out that the fact that ownership was not designated as qualified is legally immaterial. (Burgess v. Seligman, 107 U.S. 20, 2 S.Ct. 10, 27 L.Ed. 359; Tierney v. Ledden, 143 Iowa 286, 121 N.W. 1050; Colonial Trust Co. v. McMillan, 188 Mo. 547, 87 S.W. 933; Duke v. Madill, 131 Wash. 493, 230 P. 631) Certificate No. 7 for 25 shares was returned by the bank to the company about February 13, 1959.

The stock was never carried as an asset of the bank and the certificate had been kept in an envelope in the trust cage. The bank's legal contention is that it must be deemed to have priority over an unsecured creditor who years later procures a judgment, and that even though a debtor be in failing or insolvent circumstances he may validly prefer

creditors (Gruenwald v. Moir Hotel Co., 96 F.2d 932 (7th Cir. 1938); Rice v. United Mercantile Agencies, 395 Ill. 512, 70 N.E.2d 618 (1947); Nelson & Co. v. Leiter, 190 Ill. 414, 60 N.E. 851 (1901); Pliley v. Phifer, 1 Ill.App.2d 398, 117 N.E.2d 678 (1954)), even if the transfer is to relatives (Albers v. Zimmerman, 376 Ill. 306, 33 N.E.2d 452 (1941)). And, where a payment is made to a creditor it is presumed to be honest and not fraudulent (Wood v. Clark, 121 Ill. 359, 12 N.E. 271 (1887)). Plaintiff disputes these facts. He contends that the stock being registered on the books of State-Wide as owner, the bank must legally be so considered, and that it did receive dividends.

The bank admits receiving $201.03 on December 4, 1956, as partial payment of fees which it applied to TC 11081 on which $1,946.10 was then owing. However, a letter from State-Wide, dictated by Kamm, dated November 28, 1956, states the sum represented "dividends" on preferred stock issued the bank. The bank vigorously denies recollection of ever having received such a letter. It points to a letter of November 7, 1958, covering a payment of $114.59 which stated:

> "Pursuant to the understanding we previously had, payments of interest on the preferred stock are to be applied toward payment of our obligations to you."

Similarly, on February 3, 1959, State-Wide wrote:

> "This stock, you will recall, was given to you * * * with the understanding that payment made to you on the preferred stock would be applied on our account with you."

On February 6, 1959, State-Wide wrote that its final payment of $5,000 "represented payment in full of your services" and expressed appreciation for "the substantial reduction which you gave us in the total amount of the outstanding bill for services rendered to our corporation."

These communications plaintiff discounts as occurring years after the trans-

fer and not contemporaneously. The bank points out that the sums of $69.13 received on February 28, 1957, $398.20 received on August 7, 1957, and $114.59 received on November 13, 1958, a total of $782.95, were received not as dividends but payment of fees. The sums were not the five per cent yearly dividend, but were odd amounts at odd dates. The bank cites the statement covering the November 7, 1958, payment: "Pursuant to the understanding we previously had, payments of interest on the preferred stock are to be applied toward payment of our obligation to you." There is a similar statement of February 3, 1959: "Payment made to you on the preferred stock would be applied on our account with you."

The sale of the real estate of State-Wide was consummated on January 5, 1959, for $3,800,000. Kamm's affidavit of February 14, 1963, stated the contract of sale was dated August 1, 1958. State-Wide received $1,309,730.16 in cash and promissory notes totaling $427,500, secured by second mortgage on the property. The minutes of the company reveal a plan of dissolution adopted in June and July of *1958*.

The Illinois Secretary of State issued a certificate of withdrawal to the company on June 8, 1959, and it was dissolved under the laws of Delaware on June 24, 1959.

Irving Nathan alleges he was the owner of 70 shares of preferred stock of State-Wide from January 1, 1955, until its purchase by the company on January 30, 1959. He states that he performed accounting services for State-Wide prior to December 10, 1954, for which it was agreed the fee would be $1,000 to be paid by the issuance of ten shares; that on December 24, 1954, he purchased fifty shares of preferred stock in consideration of the payment of $5,000. He purchased ten shares from one Philip McKenna on February 20, 1958. Nathan points out that the preferred stock had no voting power and did not participate in the plan of dissolution which was not fully consummated until five months after his stock had been redeemed, at a time when State-Wide was amply solvent, having approximately $600,000 in cash and $500,000 in a note secured by a junior mortgage on the premises at 205 West Wacker Drive, Chicago. He seeks vacation of the December 19, 1962, judgment against him on these grounds.

Nathan's answers to requests for admission disclose that on January 16, 1959, State-Wide issued its check to Kamm for $486,850, which he deduces from Kamm's affidavit was an "advance" on an initial liquidating dividend on the common stock Kamm owned and was an account receivable of the company. Further, he believed that during the first six months of 1959 State-Wide had an outstanding mortgage note with a principal balance of $1,900,000, secured by the property in question with a value of approximately *twice* the amount due. The mortgage note was released and satisfied of record in 1962. Third party defendants state that as of December 15, 1958, the principal balance of the note was $1,872,500.

Plaintiff questions solvency of State-Wide at the time of the redemption of the preferred stock in that the second mortgage for 427,500 of notes was of "dubious value" and was soon thereafter, in June, 1959, exchanged for $70,000 in cash and $210,000 in securities issued by Kamm's company called Small Investors Real Estate Corporation and all of those securities proved to be worthless. Plaintiff, in answer to request for admission, answered, subject to his objection, that he is informed that the second mortgage notes were compromised for less than $335,000 and that the trust deed for same was released of record in 1962. Plaintiff also points out that State-Wide remained liable after the sale on its first mortgage note, amounting to $1,872,500, which was many times more than the remaining assets. On the other hand, defendants maintain the realty was worth twice the value of the first mortgage. Plaintiff further maintains that it is irrelevant to determine the amount of assets remaining after the payment of the pre-

ferred stockholders because when the liquidation was completed all of the assets had been distributed without making payment or adequate provision for plaintiff.

Plaintiff maintains that from the time the building was sold, January 5, 1959, until complete dissolution at the end of June, the whole process was one of liquidation, and not separable transactions as to distribution to the preferred stockholders in January, when, possibly, sufficient assets remained, and the final distribution to the common stockholders in June. He further contends that the preferred stockholders, although formerly creditors, became inferior to other creditors on receiving the preferred stock (Oklahoma Hotel Bldg. Co. v. Houghton, 202 Okl. 591, 216 P.2d 288, 16 A.L.R.2d 1307 (1949)).

Plaintiff states the preferred stock was not redeemed pursuant to Section 243 of the Delaware Corporation Act, which permits corporations to retire preferred stock if assets remaining are sufficient to pay corporation's debts, but that the retirement of the preferred stock was part and parcel of one liquidation plan covered by the same stockholders' resolution.

Plaintiff cites Section 244(e) of said Act, which requires notice of reduction of capital to be published three times in a newspaper and "in default thereof * * * the stockholders shall be * * liable up to the amount of such sums as they may respectively receive of the amount so reduced." Plaintiff states the retirement was not in accord with the provisions of the Delaware law.

It is pointed out by plaintiff that the "initial dividend was paid to Kamm on January 16, 1959, *before* any of the preferred stock was retired." There seems to be some question as to whether this payment to Kamm was an advancement, or a dividend, and whether the repayment by Kamm to the company and the reissuance of a check to him were simply bookkeeping entries to correct the corporation's improper issuance of the check to him personally instead of as a liquidating distribution.

Plaintiff also argues that the defendants' defense of solvency at the time of distribution is immaterial in that that theory is applicable only to *going* corporations, and when there is a liquidation the plan must be such as to provide for the payment of all creditors. (Neill v. Phinney, 245 F.2d 645 (5th Cir. 1957); Benoit v. Commissioner of Internal Revenue, 238 F.2d 485 (1st Cir. 1956)). Additionally, plaintiff contends that preferred stockholders have no preferred status over creditors—only as to common stockholders—in respect to the corporate assets on liquidation.

As to solvency of the company, the answers to the requests would indicate that from January 5, 1959, and for some five months after the redemption of the preferred stock, until about June 20, 1959, the company held $427,000 of notes secured by a purchase money second mortgage on real estate it formerly owned and in that period sold notes to the Small Investors Real Estate Corporation for $70,000 cash and $210,000 notes. On June 30, 1959, after payment of all company debts (other than Snyder's) the company held those notes and had other assets totaling $596,673.47. On that date, the company turned over part or all of those assets to Kamm, liquidating trustee, delivering a total of $657,557.50, and the $210,000 in notes was distributed to the common stockholders. The check for $486,850 from the company to Kamm, which is said to be an advance, was refunded by him to the company on June 30, 1959. The balance due on the first mortgage of the company as of December 15, 1958, was $1,872,500, and interest of $3,803.52.

Net worth, five months after the payment for the preferred stock was shown by the company's books to be $975,565.64, but it is said to be somewhat less "because the second mortgage notes and $4,707.17 of miscellaneous assets were sold at discounts totaling $158,392.17, and liabilities shown included a reserve of only $10,000 for the Snyder claim."

On June 30, 1959, the company delivered checks to Kamm to provide for payment of indebtedness of the company, and a check for $60,884.03 to Kamm to provide for payment of the remaining liabilities shown on the books of the company, and a reserve of $10,000 for the Snyder claim. After giving effect to these payments there were no remaining liabilities shown on the books of the company. The same day checks were delivered by the company to Kamm, as liquidating trustee, for $552,800 and $43,873.47 so that he had $606,673.47 available for payment of the Snyder claim, defendants maintain. The company also had $210,000 in debentures and notes from Small Investors Real Estate Corporation. The preferred stockholders point out they had no control over the June, 1959, distribution by the company.

Arthur J. Stillman's affidavit reveals that he is an accountant, employed by the Sonnenschein firm, and was there in 1954 and 1955, during which years the firm's books reflect charges against State-Wide for a total of $20,000, for which two certificates for 100 shares each of the company's preferred stock, having total par value of $20,000, were delivered respectively on December 10, 1954, and April 1, 1955. Stillman advised the individuals to return their share of the par value of the stock as income for 1954 and 1955. When the stock was redeemed the payments were made to the individuals, not as members of the firm.

The affidavit of Thomas Carlin reveals that he is a partner in the Sonnenschein firm. In describing the corporate powers of State-Wide he points out that the company possessed the power to redeem any preferred stock at the time of paying dividends, the preferred stock had no voting power, the power being vested exclusively in the common stockholders.

Despite the repeated assertions of the solvency of the company at the time of the retirement of the preferred stock in January and February of 1959, the actual affluence of the company does not seem too evident. Why were accrued dividends not paid on the preferred stock at the time of retirement? Why did the American National Bank agree to a "substantial reduction" ($198.97) in its actual bill for services as a transfer agent?

The narrow question here would seem to be not of the insolvency of the company either in January or June of 1959 but whether these third parties' preferred stock was *purchased* by the company independently of any plan of liquidation. A reply brief of defendants states:

"We do not question the principle that when a corporation is dissolved assets should be distributed first to creditors and then stockholders and that many courts have referred to the assets in the hands of the corporation at the time of its dissolution as being a 'trust fund.' In the case at bar, the corporation was dissolved and liquidated in June, 1959. At that time, long after the preferred stock had been purchased and while it was being carried as treasury stock, State-Wide was amply able to pay all of its creditors and had a substantial surplus for the benefit of common stockholders."

Third party defendants point to the fact that the June, 1958, resolution covering liquidation provided for the *cancellation* of the preferred stock turned in, but the instant shares were not cancelled when turned in, and in fact that cancellation did not occur until in June, 1959, when the actual liquidation of the company took place. They also point to the fact that the plan covered by the resolution could have been abandoned after its promulgation.

Kamm on *February 3, 1959,* wrote the American National Bank that the Engineering Building had been sold and "*Distribution* of the proceeds of sale is being made through our own offices." That letter is somewhat enigmatic for a lawyer to write. He stated:

"I should like to straighten out our account with you and terminate your services as transfer agent for both the debentures and the common

740

stock. You hold 25 shares of preferred stock. This stock * * * was *given* you at the time when State-Wide Properties, Inc. took over the Engineering Building, with the understanding that payment made to you on the preferred stock would be applied on our account with you. There are several adjustments to be made in our account with you. * * * " (Italics supplied.)

If the stock were actually pledged the word "pledge" could have been used. The word "given" denotes a transfer. On the other hand, if the stock were the bank's, the payments should have been called dividends with the bank's absolute right thereto without power in the company to designate their application. If the stock were simply pledged, why did Kamm write when sending the check for $2,500 on February 6, 1959, that it was "in full payment and retirement of the 25 shares * * * standing in the name of the * * * Bank."? If it had been a pledge he should have said the check was in payment of the debt collateralized by the stock. The bank states that its record reveals the receipt of no such letter dated November 28, 1956, nor does any officer or agent have a recollection thereof and denies that the payment of $201.03 was a "dividend" but was a partial payment of some $1,946.10 fees owing it, nor did it receive any other dividend and specified the four payments it did receive.

On information and belief the bank denied that the company had no assets remaining for payment of plaintiff's claim in the six-month interval between payment of the preferred stockholders and the dissolution of the company, but maintains that the company had assets allocable to the Snyder claim in excess of many hundreds of thousands of dollars.

The answer of Nathan to the requests for admissions states:

"He admits that on January 16, 1959, State-Wide * * * issued its check to Maurice H. Kamm in the amount of $486,850, as an initial liquidating dividend, but under-

stands that said sum represented an advance against an initial liquidating dividend on the common stock."

He further states that on or about "June 30, 1959, State-Wide * * * had assets sufficient to pay Clinton B. Snyder the amount of the judgment subsequently obtained by him."

The minutes of the company for July 7, *1958*, reveal the adoption of a resolution adopting the "plan of *complete liquidation* of STATE-WIDE * * * under Section 337 of the Internal Revenue Code. * * * " The plan provided that the property be sold as soon as possible "and its *liabilities discharged.* All of the property * * * then remaining shall at once be distributed to the stockholders of the corporation in complete cancellation and redemption of all of the outstanding shares of the corporation on the surrender of the certificates. * * * " (Italics supplied.)

The minutes for a special meeting of the board of directors on November 7, 1958, approved the resolution that

" * * * [U]pon consummation of the sale of the property * * * and pursuant to the plan of complete liquidation of the corporation * * * a first *liquidation* distribution of $50 per share be forthwith made in cash upon all of the outstanding shares of common stock. * * * " (Italics supplied.)

A letter of February 10, 1959, to State-Wide stockholders from Kamm, as president, states:

"Pursuant to previous action of the Board of Directors and the stockholders * * * the Corporation is being *liquidated.* * * * The Directors * * * have authorized an initial liquidating distribution of $50 per share. * * * " (Italics supplied.)

A letter from Nathan, dated June 24, 1959, listed a schedule of checks to be disbursed in connection with the final liquidation of the assets of the company, which included a $10,000 payment to Kamm as liquidating agent for contin-

gent liability to plaintiff, as well as a check for $552,800 to Kamm as liquidating agent to cover $50 a share on the 11,056 shares of common stock outstanding.

Nathan's deposition reveals his figures —a balance sheet based on his work sheets because he was unable to find the ledgers and journals of the company for 1959. His balance sheet shows a net worth on the books of $975,565.64 five months after the purchase of the preferred stock. But the brief of Levinson states the net worth was somewhat less because the second mortgage notes and other assets were sold at discounts totaling $158,392.17 and only a $10,000 reserve for Snyder's claim.

The brief states that on June 30, 1959, Kamm had a total of $606,673.47 on hand to pay stockholders and Snyder's claim. The plan provided for payment of debts. Kamm had the money therefor and the duty to pay and if he breached his duty by paying himself and other common stockholders the preferred stockholders cannot be held liable therefor. The sums paid the preferred stockholders ceased to be assets of the company. Defendants go on to assert that only upon insolvency do the corporate assets become a trust fund for creditors (McDonald v. Williams, 174 U.S. 397, 19 S.Ct. 743, 43 L. Ed. 1022).

Another reply brief argues that a court order directed Kamm to turn over real estate to plaintiff yet no cognizance is taken of the value of that real estate; that there is no basis for finding the preferred stock retirement was by virtue of the June 20 and July 7, 1958, resolutions because the preferred stock, though purchased on January 26 and January 30, 1959, by the company, was not "redeemed" and "retired" *then*. In fact, it was not retired until June, 1959. It further asserts that the payments by Kamm to the company and the company to Kamm were not mere bookkeeping entries but payment by him of a debt and transfer by the company to the liquidating trustee.

Glynn answered that at the time of the payments to him he had no knowledge of the pendency of this suit. He states he had purchased the forty shares on December 3, 1954, for $4,000. He, too, alleges that State-Wide was solvent at the time of payment for the preferred stock and had adequate funds on hand to satisfy all outstanding creditors.

There seems not to be much dispute about the various figures and facts stated above. All the affidavits, answers to requests for admissions and documentary evidence are in agreement as to the price for which the building was sold, the method of payment, and the amount and disposition of the notes given. The principal actor in all the transactions is dead, but various affidavits, documents, resolutions, checks, et cetera are subject to scrutiny.

■■ Dubious as the solvency of the company might seem at the time of the payments to the preferred stockholders, the court does not reach that issue in view of its conclusion that the company was in liquidation, with a consequent duty to pay creditors before retiring stock.

■ There is no evidence that the company actually did further business after the sale of its only large asset: the building. This suit had been pending over a year at the time of the payment to the preferred stockholders, although the judgment was not procured for some years later. A $10,000 reserve (irrespective of who suggested the amount) proved highly inadequate to cover the $152,800 judgment which eventuated. The dissolution of the company could not affect the rights of a creditor under a pending suit. (United States v. P. F. Collier & Son Corp., 208 F.2d 936, 40 A.L.R.2d 1389 (7th Cir. 1953); Melrose Distillers, Inc. v. United States of America, 258 F.2d 726 (4th Cir. 1958), affirmed in 359 U.S. 271, 79 S.Ct. 763, 3 L.Ed.2d 800; Ochs v. United States, 305 F.2d 844, 158 Ct.Cl. 115 (1962)).

■ Irrespective of the condition of solvency or insolvency, there was here such a complete cessation of business and formal steps toward dissolution as to

invoke the well-known trust fund theory of corporate assets for the benefit of creditors (Stewart v. United States, 327 F.2d 201 (10th Cir. 1964)). As was said in Hatch v. Morosco Holding Co., 50 F.2d 138, 139 (2nd Cir. 1931):

> " * * * When the assets of a corporation are distributed to its shareholders leaving corporate debts unpaid, liability of the shareholders to a creditor, to the extent of the value of the assets received is beyond question."

In Fletcher, Cyclopedia Corporations § 7581, it is said:

> "Where a person, whether a stockholder or not, receives the assets of a corporation upon the liquidation of the corporation, whether *insolvent or not,* if it leaves the corporation without assets with which it can be made to respond to its creditors, and the suit is to reach the assets as such or their value, undoubtedly such person should be required to respond to the full amount of the assets so received." (Italics supplied.)

If the rule is, as stated in 13 American Jurisprudence, Corporations § 1376, p. 1212, "[i]t is accordingly true that in distributing the assets of a dissolved corporation, the debts and liabilities of the corporation are to be satisfied before *any* distribution to stockholders is made," it is immaterial that the company remained solvent, if it did, after the payment to defendant preferred stockholders. It is also stated in the same work § 1352, pp. 1196–1197:

> " * * * [T]he general equitable rule now followed in this country is that upon the dissolution of a corporation, the property and assets of the corporation constitute a trust fund for the benefit of its creditors and stockholders. * * * Stated in another way, the rule is that after the dissolution of a corporation, its property passes to its stockholders subject to the payment of the corporate debts.
>
> "In accordance with these principles, a dissolution of a private cor-

poration entirely changes the character of the property interest of its stockholders."

The problem in this case arises from the fact of the several months' interval between the payment to the preferred stockholders and to the common stockholders, thereby furnishing the basis to defendants' argument that the payment to them, the preferred stockholders, did not deplete the company's assets to the point of insolvency; rather, it was the much later, large payment and distribution to the common stockholders which left insufficient funds to pay plaintiff creditor.

However, the court sees the liquidation of State-Wide as an overall, singular situation, requiring that no stockholder receive distribution until all creditors are paid or completely provided for. There can be no question that the Delaware Law, Section 243, permits corporations to purchase and retire preferred stock if the assets remaining are sufficient to pay all of the corporation's debts *not otherwise provided for.* Defendants point out that although the preferred stockholders were paid in January of 1959, their stock was not then retired—not, in fact, until June, 1959—so there is no inference that the stock was taken pursuant to the previous June and July, 1958, resolutions concerning corporate dissolution.

While it is argued that at the time *these* stockholders were paid the company had left sufficient assets to pay the amount of plaintiff's judgment, especially if the nearly half million dollar prior payment to Kamm be deemed an "advance" and not a $50 first liquidating payment per share on his common stock, the court is of the opinion that as a practical matter such payment was a liquidating dividend and not an advance, being for the precise amount later paid other common stockholders, and the amount specified in the corporate resolution. It was later again returned to him as liquidating trustee to be repaid to himself as well as to other common stockholders.

■ The court is not clearly convinced that the stock possessed by the American

National Bank was held by it as pledgee to secure its fees as transfer agent. Rather, it would seem to have followed the pattern of the issuance of the other preferred stock in payment of fees to the attorneys and auditor. It is possible that the bank did not carry the stock on its books as an asset because when it first received the certificate it had not yet earned the full sum represented by the certificate. The letter from Kamm, which the bank disputes receiving, calls the payment to it a dividend on the stock by it held.

The motion of plaintiff for summary judgment is granted as to each of third party defendants Irving Nathan, James E. Glynn, American National Bank and Trust Company of Chicago, and Arthur J. Stillman as nominee for Hugo Sonnenschein, Herbert M. Lautmann, David Levinson, Edward P. Morse, Leonard M. Rieser, Leo J. Carlin, Bernard Nath, Louis P. Haller, Roger S. Block, Ben Rothbaum, Tom Carlin, Samuel Rosenthal, Charles D. Satinover, Jerome S. Weiss, Frank C. Bernard, John J. Faissler, Abraham Fishman, Jack Levy and Henry S. Moser. The motions for summary judgment of the respective third party defendants are denied.