CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, and Arthur H. Bunte, Jr., Trustee, Plaintiffs,

v.

E. Louise CARDWELL, an individual, Defendant.

Case No. 12 C 7715.

United States District Court, N.D. Illinois, Eastern Division.

Signed Sept. 3, 2014.

Charles H. Lee, John Joseph Franczyk, Jr., Rathna Rodgers, Timothy Craig Reuter, Rebecca Kate McMahon, ·Central States Law Department, Rosemont, IL, for Plaintiffs.

James Brendan Sherman, Wessels Sherman Joerg Liszka Laverty Seneczko P.C., Minneapolis, MN, Paul W. Chamberlain, Chamberlain Law Firm, PLLC, Wayzata, MN, Sean F. Darke, Wessels Sherman Joerg Liszka Laverty Seneczko P.C., Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

MILTON I. SHADUR, Senior District Judge.

This Court's June 6, 2014 memorandum opinion and order ("Opinion") held defendant E. Louise Cardwell ("Cardwell") liable to plaintiffs Central States, Southeast and Southwest Areas Pension Fund and its Trustee Arthur H. Bunte, Jr. (collectively referred to as "the Fund" for convenience) for the fraudulent transfer to Cardwell, the sole shareholder of Healy Spring Company ("Healy Spring"), of valuable real estate in conjunction with Healy Spring's liquidation without having paid or provided for payment of a large *consent* judgment for nearly $250,000 that was entered against Healy Spring because of its withdrawal liability under ERISA.[1] Indeed, the fraudulent nature of the transfer was so patent that it is difficult to understand how Cardwell and her counsel could oppose this action in the objective and subjective good faith demanded by Fed. R.Civ.P. ("Rule") 11(b) and, as to counsel, perhaps 28 U.S.C. § 1927 as well: Cardwell caused Healy Spring to transfer that

---

1. That stipulated judgment was entered on December 18, 2008 by this Court's then colleague Honorable Wayne Andersen, to whose calendar the case had been assigned.

real estate (referred to in the Opinion as the "Central Avenue Property") on May 15, 2008 (just *one day after* the Fund had brought suit for withdrawal liability against Healy Spring), and she permitted the consent judgment on account of that withdrawal liability to be entered against the denuded-of-assets Healy Spring some months later.

At that point all that remained in this action was to calculate the amount that Cardwell owed the Fund by reason of her misconduct. On that score the consent judgment's Decretal Paragraph C, which required quantification, added this to the agreed judgment amount of $243,479.93:

> That Plaintiffs are awarded post judgment interest on the entire judgment balance at an annualized interest rate equal to two percent (2%) plus the prime interest rate established by Chase Manhattan Bank (New York, New York) for the fifteenth (15th) day of the month for which interest is charged and shall be compounded annually as set forth in the Central States Pension Plan and Trust Agreement.

Accordingly, when the Fund noticed up for presentment on August 15, 2014 its motion for entry of final judgment against Cardwell, with Cardwell and her counsel having said neither "aye" or "nay" to the Fund's calculation, this Court entered a brief minute entry (Dkt. 61) that ordered Cardwell's counsel "to file by 8/27/2014 citations of any caselaw bearing on defendant's obligation to pay post judgment interest on the judgment against the dissolved corporation."

On August 27 Cardwell's counsel did indeed file "Defendant's Response to August 15, 2014 Order." Most importantly in substantive terms, that filing acknowledged the correctness of the Opinion's holding as to the existence of Cardwell's

liability to the Fund—here is the penultimate sentence of that Response:

> Defendant agrees that she is liable for the amount of the judgment entered against Healy Spring Company ($243,-479.93), attorney's fees ($17,143.50), and costs ($1,880.48).

But as to this Court's August 15 directive to quantify that liability in terms of post judgment interest vel non, the Response was really unprofessional—it stated that counsel had conducted research but that:

> Despite their effort, Defendant's attorneys were unable to find any case law similar to the case at hand that supported or opposed the argument that an individual Defendant has an obligation to pay post judgment interest on a judgment against the dissolved corporation. Defendant's attorneys did find some case law that allowed for a judgment of post judgment interest stemming from a judgment against a dissolved corporation but the cases are distinguishable as they involved individuals whose liability resulted from a piercing of the corporate veil.

There is really no mystery about the characterization of that last sentence's disclaimer as "unprofessional." There Cardwell's counsel has flouted the obvious and fundamental concept that it is for the court and not for counsel to determine whether the prior caselaw is on all fours with the case at issue or whether it may instead be distinguishable (and in the latter case whether, though distinguishable, the earlier caselaw is instructive in resolving the issue—the situation in which the difference between the earlier cases and the current one is often spoken of as "a distinction without a difference"). It is really inexcusable for counsel to say "yes, we 'did find some case law that allowed for a judgment of post judgment interest stemming from a judgment against a dissolved

corporation'" but that "we don't think those cases are relevant," without identifying those prior cases so that the *court* can make its own (and controlling) decision on that score.

In any case, this Court put its able law clerk to the task that counsel should have performed but didn't—and that search turned up the opinion in *Central States, S.E. & S.W. Areas Pension Fund v. Minneapolis Van & Warehouse Co.*, 764 F.Supp. 1289 (N.D.Ill.1991), an opinion written by this Court (no less) and startlingly parallel to this case: It was brought by the selfsame Fund that is plaintiff here against a Minnesota corporation (as Healy Spring was in this case), and it (exactly like this case) dealt with the responsibility of the corporation's sole stockholder (also a defendant in that case) to pay withdrawal liability under ERISA where a transfer of corporate assets had been made without satisfying or providing for satisfaction of that liability. Although that case did not speak to the responsibility for post judgment interest under the specific circumstances presented here (obviously so, for no consent judgment had been entered there), its thrust clearly points to the answer to that question for this case.

With *Minneapolis Van* having been discovered, this Court had initially considered its usual procedure of selective quotation from a prior case that bears on a current one. But here the identity of analysis is so compelling that the rhetorical assertion that the earlier opinion "could have been written for this case" is literally true. So even though this Court often repeats the appropriate lesson from our Court of Appeals that District Court opinions are not precedential (and it accordingly seldom cites to or quotes from them in its own opinions), here the wholesale incorporation of *Minneapolis Van's* entire discussion on the subject of shareholder liability remains so compelling to this Court (which cannot of course be accused of plagiarism in so doing) that it attaches relevant pages 764 F.Supp. at 1293–97 in their entirety to this opinion.

To be brief, nothing in Minnesota law alters the fundamental analysis that applies here, under which the situation should be treated just as though Healy Spring had remained in existence while its liability under the consent judgment remained unsatisfied, as it is to this day, and as though Cardwell's stripping of Healy Spring's ability to pay that judgment by her fraudulently self-dealing acquisition of the major corporate asset that could and should have been used to satisfy that judgment prevented the corporation itself from doing so. Remember that Cardwell could have cut off any further accrual of interest by the simple act of satisfying the judgment through the use of the Central States Property, and her failure to do so renders her liable to pay that judgment in accordance with its terms (*including* the liability for ongoing interest charges as specified in the judgment itself).

Hence the Fund's proposed judgment order in this case provided an appropriate itemization of the then aggregate amount of $344,139.59 as of August 7, 2014. To be sure, Cardwell had retained something less than that—$332,330.17—for herself out of the $495,000 sale price that was realized on the September 26, 2008 sale of the Central States Property. But that does not of course take account of Cardwell's continued retention for nearly six years of her latched-onto proceeds from the sale of the real estate (once again she kept and reinvested those proceeds instead of honoring her obligation to pay the consent judgment).

To make the Fund whole, this Court adds to the Fund's calculation the further delinquent charge of $1,376.16 to reflect a

September 1 rather than an August 7 obligation,[2] so that judgment is ordered to be entered in favor of plaintiffs Central States, Southeast and Southwest Areas Pension Fund and trustee Arthur H. Bunte, Jr. and against E. Louise Cardwell in the total amount of $345,515.75.[3] Be-

cause it would seem beyond dispute that Cardwell's realization from the property's sale, taking into account her use of the proceeds for a period of years, would far exceed that figure, the burden is on her to establish that she is not responsible for the entire amount specified here.

2. That amount is based on the detailed month by month calculation attached as Ex. 1 to the affidavit of Andrew Sprau, which in turn is Ex. A to the Fund's Motion for Prove-up of Damages and for Entry of Judgment.

3. This Court recognizes that the text calculation shortchanges plaintiffs somewhat—it makes no allowance for their additional attorneys' fees or any additional expenses attributable to their most recent efforts toward enforcement of the judgment, nor does it take into account any amount (presumably less than $1,000) that is addable to the consent judgment figure as of September 15 if the payment obligation is not honored by then. But because the moving-target phenomenon would always change the precise judgment figure on a day-to-day basis and because no per diem number was included in the Fund's submission, it is best to settle on a determination that is essentially correct. What has been ordered in the text does so.

mand notwithstanding any request for review or appeal of determinations of the amount of such liability or of the schedule.

MPPAA therefore sets up a "'pay now, dispute later' collection procedure" (Robbins v. Pepsi–Cola Metropolitan Bottling Co., 800 F.2d 641, 642 (7th Cir.1986) (per curiam)). Thus even though Section 1401(a)(1) provides that disputes arising under Sections 1381 through 1399 are to be resolved through arbitration, Section 1401(d) nevertheless requires interim payments:

> Payments shall be made by an employer in accordance with the determinations made under this part until the arbitrator issues a final decision with respect to the determination submitted for arbitration, with any necessary adjustments in subsequent payments for overpayments or underpayments arising out of the decision of the arbitrator with respect to the determination.

If the employer fails to make such interim payments, the pension fund may bring a district court action to compel payment (Section 1451(b) and (c)).

It is therefore beyond question that Minneapolis Van was required to begin making interim payments—as scheduled by Pension Fund—60 days after Pension Fund demanded withdrawal payments. Furthermore, Minneapolis Van continued to be liable for such payments despite the existence of any underlying dispute. Contrary to its contention, this situation is not one where this Court should reserve decision pending the outcome of arbitration. In expressly providing for interim payments and their immediate enforcement *pending arbitration,* MPPAA makes it clear that exhaustion of the administrative remedy is neither necessary or sensible. Any errors made in calculation can be corrected either by the arbitrator or by later judicial review (Section 1401(b)(2)).

5. In collection actions, MPPAA provides that delinquent withdrawal liability payments are to be treated in the same manner as delinquent employer contributions (Sections 1145 and

[2] Of course this Court has not been asked to resolve—and indeed should not engage in resolving—the underlying factual dispute (*Robbins v. McNicholas Transportation Co.,* 819 F.2d 682, 686 n. 4 (7th Cir.1987)):

> Ordinarily, in the absence of a demonstration that making interim payments would inflict irreparable injury on an employer, a court should enforce the interim payments requirement without examining the merits of the underlying dispute concerning withdrawal liability. Even when a court denies interim payments based on demonstrated irreparable injury and a preliminary review of the merits, the underlying dispute should still be arbitrated.

No preliminary injunction was requested here, and in any case Minneapolis Van has not suggested irreparable injury. Nor could it: It has no operations or other activities that could be disrupted by the interim payments. Indeed, as explained in *Central States Southeast and Southwest Areas Pension Fund v. Bellmont Trucking Co.,* 788 F.2d 428, 432–34 (7th Cir.1986) imposition of withdrawal liability even on an employer no longer obligated to make payments to a pension fund due to bankruptcy clearly furthers MPPAA's policy.

Consequently this Court holds that Minneapolis Van is liable for all past due withdrawal liability payments. It is additionally liable for interest, fees, costs and liquidated damages in accordance with Section 1132(g)(2); see *Central States, Southeast and Southwest Areas Pension Fund v. Gerber Truck Service, Inc.,* 870 F.2d 1148, 1156 (7th Cir.1989) (en banc).[5]

### Bruesehoff's Interim Withdrawal Liability

Pension Fund does not seek to impose personal liability on Bruesehoff for the interim withdrawal payments either as an "employer" within ERISA's subchapter III (governing such liability) or on the piercing-the-corporate veil or alter ego lines of

1451). Because Section 1145 is in turn enforced through Section 1132, it follows that actions for withdrawal liability are similarly enforced through Section 1132.

analyses most frequently encountered in attempts to saddle stockholders or officers or directors with the obligations of their corporations. Instead Pension Fund points to Brueschoff's having received—without giving value for value—the assets of Minneapolis Van that would otherwise have been available to satisfy Pension Fund's statutory claim.

[3–5] Corporate veil-piercing is no longer an issue once a company has dissolved, for there is no longer a veil to be pierced. Rather, what is involved is a basic tenet of corporate law (*Snyder v. State-wide Properties, Inc.*, 235 F.Supp. 733, 742 (N.D.Ill. 1964), aff'd 353 F.2d 3 (7th Cir.1965), quoting *Hatch v. Morosco Holding Co.*, 50 F.2d 138, 139 (2d Cir.1931)):[6]

> When the assets of a corporation are distributed to its shareholders leaving corporate debts unpaid, liability of the shareholders to a creditor, to the extent of the value of the assets received is beyond question.[7]

Any such distribution of assets is deemed a fraud on creditors (15A Fletcher § 7417 (1990 rev. vol.)). That universal rule of stockholder liability is simply a function of the basic concept that stockholders are remaindermen—that their interest is only in the equity, only in what is left over after *all* the corporate obligations have been paid.

Another way of framing that concept is the familiar terminology of the "trust fund" (*Snyder*, 235 F.Supp. at 741-42, cit-

ing *Stewart v. United States*, 327 F.2d 201 (10th Cir.1964)):

> Irrespective of the condition of solvency or insolvency, ... such a complete cessation of business and formal steps toward dissolution ... invoke the well-known trust fund theory of corporate assets for the benefit of the creditors.[8]

That trust fund theory is a common law doctrine that "has longstanding antecedents in the federal courts which may be traced back, in part, at least as far back as the noted decision by Justice Story in *Wood v. Drummer*, 30 Fed.Cas. 435 [No. 17, 944]" (*Commissioner v. Stern*, 357 U.S. 39, 50, 78 S.Ct. 1047, 1053, 2 L.Ed.2d 1126 (1958) (Black, J., dissenting)).

[6] And of course the application of that trust fund doctrine to the recovery of withdrawal liability under MPPAA is wholly consistent with this Court's authority to provide "appropriate equitable relief" (Section 1132(a)(3)(B)). As *Stormer v. Charlie's Cafe Exceptionale, Inc.*, No. 4-87-575, slip op. at 17 (D.Minn. May 4, 1988) has put it:

> Allowing recovery of withdrawal liability payments under this doctrine promotes the stability and solvency of multiemployer pension plans without imposing new or unexpected burdens on an employer. Unlike an action against shareholders under an expansive definition of "employer," recovery under the trust fund doctrine does not pose the threat of personal liability without regard to the shareholder's receipts from the corpora-

6. *Snyder* was decided by Honorable Edwin Robson, later to become Chief Judge of this District Court. Despite the passage of over a quarter-century since *Snyder* and of some 60 years since *Hatch*, the universality of the principles those cases set out and the fact that they stem from the inherent nature of the stockholder's relationship with the corporation make them as rock-solid today as when *Snyder* was written.

7. [Footnote by this Court] *Snyder, id.* also supported that proposition with this quotation from Fletcher, *Cyclopedia Corporations* § 7581 (emphasis added by *Snyder*):

> "Where a person, whether a stockholder or not, receives the assets of a corporation upon the liquidation of the corporation, whether *insolvent or not*, if it leaves the corporation without assets with which it can be made to

respond to its creditors, and the suit is to reach the assets as such or their value, undoubtedly such person should be required to respond to the full amount of the assets so received."

8. [Footnote by this Court] Sometimes courts have spoken of the trust fund doctrine as though it were a principle applicable only to *insolvent* corporations (which perhaps provide the most frequent occasion for application of the doctrine). But even were that so (and it is not), a corporation that distributes all its assets in the course of dissolution is rendered insolvent (by definition) by the very act of distribution if it turns out that all the corporation's obligations have not been paid or provided for.

tion. Recovery is limited to those assets transferred to the shareholder before the corporation's debts have been satisfied. Thus, establishing a cause of action under the trust fund doctrine is consistent with the policies of ERISA because it will not discourage entry into a multiemployer plan and may encourage plan entry by protecting the remaining employers contributing to the plan.

[7] Up to now this opinion has spoken in terms of the universality of corporate law—as though there were a federal common law in the area (despite Justice Holmes' disclaimer of such a "brooding omnipresence in the sky" (*Southern Pacific Co. v. Jensen*, 244 U.S. 205, 222, 37 S.Ct. 524, 531, 61 L.Ed. 1086 (1917)). And it is certainly true that when interpretation of a federal statute such as ERISA is involved, federal law does represent the applicable source of law—and in the case of ERISA in particular, Congress did intend that "a body of Federal substantive law will be developed by the courts to deal with issues involving rights and obligations under private welfare and pension plans" (*Franchise Tax Board of California v. Construction Laborers Vacation Trust for Southern California*, 463 U.S. 1, 24 n. 26, 103 S.Ct. 2841, 2854 n. 26, 77 L.Ed.2d 420 (1983), quoting 120 Cong.Rec. 29942 (1974) (remarks of Sen Javits); see also *Board of Trustees of the Western Conference of Teamsters Pension Trust Fund v. H.F. Johnson, Inc.*, 830 F.2d 1009, 1014 (9th Cir.1987)). Nonetheless, because corporations are by definition the creatures of state corporate law, courts must be cautious to avoid any unnecessary collisions between (1) the rules that are established for corporations as a very condition of their existence (the state statutory provisions that are inherently incorporated into every corporate charter) and (2) the need to avoid

improper limitations or impedances on the federal policies served by ERISA (see, e.g., *Alman v. Danin*, 801 F.2d 1, 3–4 (1st Cir. 1986); cf. *Evans v. Einhorn*, 855 F.2d 1245, 1255–56 (7th Cir.1988) (per curiam)).

[8] If for example Minnesota corporate law [9] turned out to contain provisions that were inconsistent with the universally recognized doctrine that stockholders cannot receive the unencumbered benefit of corporate assets until all creditors have been paid or provided for, this Court would have to determine whether it must reject such a reference to state law as impeding the congressional goals in enacting MPPAA. Not surprisingly, such a hypothetical conflict is not realized here: Minnesota law does not depart from that universal doctrine or from the trust fund theory as its justification (see, e.g., *B & S Rigging & Erection, Inc. v. Wydella*, 353 N.W.2d 163, 167–68 (Minn. App.1984), holding that employees of an insolvent corporation can recover vacation pay against officers and stockholders—whom the law makes fiduciaries of the corporate assets for the benefit of its creditors). Hence the basic tenets of corporate law, whether viewed under the lens of either federal common law or state law, permit an ex-stockholder in Bruesehoff's position to be reached personally for satisfaction of the withdrawal liability payments.

[9] In this instance Minneapolis Van's transfer to Bruesehoff of real estate valued at $750,000 on December 30, 1988, and of the other $54,000 in assets at about the same time, left the corporation with insufficient assets to pay withdrawal liability payments to Pension Fund. Bruesehoff is therefore liable for withdrawal liability payments up to the extent of those transfers.[10] This Court accordingly exercises its equitable powers under ERISA to impose a constructive trust on the distributed assets

9. Both sides properly agree that to the extent that state law applies, this Court should look to Minnesota law (where Minneapolis Van was incorporated).

10. Although the question is almost certainly moot in light of the numbers involved, the conceptual basis of the trust fund doctrine suggests that if the distributed assets have been retained by the stockholder the principle of tracing operates (so that the measure of what is potentially reachable by any unprovided-for creditors takes into account any post-distribution appreciation or depreciation in value). Any post-distribution sale of assets, however, would freeze the measure of recovery as to those assets at the amount of the net proceeds of sale.

(or on the sale price of any assets distributed and then sold, see n. 10) for the benefit of Pension Fund.

[10] Bruesehoff complains that Minnesota Van paid off all creditors known to it at the time of its dissolution, so that Bruesehoff cannot be held liable for a claim that came to his attention only upon Pension Fund's Notice and Demand some eight months later. But even were that lack-of-knowledge claim an accurate one,[11] there is no requirement of knowledge as a precondition for imposition of liability. Minneapolis Van's MPPAA liability for withdrawal payments arose as a matter of law at the moment that the corporation dissolved and thereby effected a "complete withdrawal" (Section 1383). That liability existed (though it was then unasserted) when the distributions in liquidation were made,[12] and nothing in the trust fund doctrine requires that *this* type of creditor's claim be known to the stockholder in order to require the stockholder to satisfy the claim to the extent of the assets received.[13] Distribution alone, and *not* an affirmative intent to defraud, establishes *this* type of "fraud on the creditor."

[11] In that respect, it is worth noting that Congress has given employee benefit plans such as Pension Fund six years to bring their claims (Section 1451(f)), so it would often be possible that defendants would not have received formal notice—or even had anything but generalized constructive knowledge—of such a claim at the time of dissolution.[14] That statutory provision would plainly call for the rejection of any argument that *Minneapolis Van* cannot be held liable because Pension Fund's claim is time-barred under Minnesota law.[15] As against any general state-law period of limitations in that respect, this Court holds that MPPAA's express six-year statute of limitations controls and applies to Pension Fund's claim.

[12] What of the derivative claim against Bruesehoff? On that score defendants contend that because the Minneapolis Van dissolution was conducted (as it had to be) according to state law (Minn.Stat. §§ 302A.721 to .733), the Minnesota one-year statute of limitations (Minn.Stat. § 302A.781) should apply to bar all creditors' claims not brought within one year after the articles of dissolution were filed. But defendants' basic premise is wrong. That one-year statute does not apply to claims of creditors who were not given notice of intent to dissolve under Minn.Stat. § 302A.727—instead such creditors are afforded *two* years to sue under Minn.Stat. § 302A.729. Here Pension Fund was not given notice of the dissolution (see Bruesehoff's statement in Minneapolis Van's Articles of Dissolution, P.Mem.Ex. B, acknowl-

---

11. Pension Fund points out that any such lack of knowledge was highly unlikely, given the fact that it repeatedly advised employers of the statutory provision for withdrawal liability (see P.Mem.Ex. A).

12. Shades of the "brooding omnipresence in the sky"!

13. It should be repeated that this Court is not here adjudicating the ultimate existence or amount of Minneapolis Van's withdrawal liability, for which Bruesehoff as a transferee of its assets without consideration must stand good. Rather the point is that the law sets up a putative liability and a firm obligation to make interim payments—legal requirements as to which neither Minneapolis Van nor Bruesehoff may play ostrich. Bruesehoff thus received the assets cum onere, and if it ultimately proves that the withdrawal liability is less than Pension Fund claims—or even zero—Bruesehoff can recapture the interim payments just as Minneapolis Van could have.

14. That is not unfair to employers or to their distributees in liquidation. Such a length of time is necessary to carry out the policy of MPPAA, given the many obstacles that a multiemployer pension plan may encounter before bringing a civil action to collect (see *Occidental Life Insurance Co. of California v. EEOC,* 432 U.S. 355, 366–72, 97 S.Ct. 2447, 2454–57, 53 L.Ed.2d 402 (1977), giving policy reasons why EEOC should not have to bring suit according to state statute of limitations). For instance, in this case Pension Fund was not notified of Minneapolis' intent to dissolve. It would thwart the purposes of MPPAA if Pension Fund were given inadequate time to pursue employers that do not give notice.

15. Pension Fund incorrectly claims that defendants did not raise the statute of limitations as an affirmative defense in their answer. In fact, they did so in their Amended Answer to First Amended Complaint (*id.* at 11).

edging that all creditors were *not* given notice), and it did bring this lawsuit within two years of the notice of intent to dissolve.

That being so, the issue of which statute of limitations to apply—that under state corporate law or that prescribed by ERISA—is really moot, for it makes no difference. This situation is somewhat analogous to the so-called "false conflict" issues in choice of law jurisprudence, where courts are not called upon to resolve which jurisdiction's substantive law to apply because the same result would obtain under the law of all the competing jurisdictions (see, e.g., *In re Air Crash Disaster Near Chicago, Illinois on May 25, 1979,* 644 F.2d 594, 605 (7th Cir.1981)). It is still worth observing, however, that there is a great deal of force to the argument that the shorter Minnesota statute would be preempted by the six-year statute of limitations that Congress has expressly prescribed for actions to collect ERISA withdrawal liability. As *Holmberg v. Armbrecht,* 327 U.S. 392, 395, 66 S.Ct. 582, 584, 90 L.Ed. 743 (1946) (citation omitted) said nearly a half century ago:

> If Congress explicitly puts a limit upon the time for enforcing a right which it created, there is an end of the matter. The Congressional statute of limitation is definitive.

Thus, with a few express exceptions inapplicable here, ERISA "supersede[s] any and all State laws insofar as they ... relate to any employee benefit plan ..." (Section 1144(a)). And as stated in *H.F. Johnson,* 830 F.2d at 1016, citing *Pilot Life Insur-*

ance Co. v. Dedeaux, 481 U.S. 41, 45–46, 107 S.Ct. 1549, 1551–52, 95 L.Ed.2d 39 (1987) and *Shaw v. Delta Air Lines,* 463 U.S. 85, 98–100, 103 S.Ct. 2890, 2900–01, 77 L.Ed.2d 490 (1983):

> ERISA preemption is to be construed broadly, and is not limited to state laws designed specifically to affect employee benefit plans.

It would certainly appear that Minnesota's statute of limitations on creditors' claims "relates to" Pension Fund's claim and would therefore, to the extent applicable to ERISA-based claims of withdrawal liability, be pre-empted (see similar holding in *H.F. Johnson,* 830 F.2d at 1016). Indeed, if the rule were otherwise, every employer ceasing its business operations (the paradigmatic event that triggers withdrawal liability) could simply choose to dissolve and distribute its assets to its stockholders, thus taking an end run around the longer limitation period granted by Congress to employee benefit plans.[16]

### Uniform Fraudulent Transfer Act

As a separate cause of action, Pension Fund claims that Brueschoff is liable under the UFTA, codified at Minn.Stat. §§ 513.41–.513.51. UFTA § 5(a) (Minn.Stat. § 513.45(a)) provides that a transfer made or obligation incurred without the receipt of reasonably equivalent value is fraudulent as to creditors, without regard to any actual intent to defraud, if the debtor was insolvent or would be rendered insolvent as a result of the transfer.

Whatever the merits of that contention might be, two considerations counsel

---

16. When the author of this opinion was in his first two years in the practice of law, one of the several cases that he researched and argued before our Court of Appeals during those years dealt with the procedure under which, and the time period within which, post-corporate-dissolution or post-merger actions could be brought by a creditor of the dissolved or disappearing corporation (*Central National Bank in Chicago v. Continental Casualty Co.,* 182 F.2d 407 (7th Cir.1950)). For that purpose he reviewed the statutes (comparable to the Minnesota statute at issue here) in all of the states (then 48 in number) and the District of Columbia. All of them prescribed short limitations periods for post-dissolution actions—one or two years was typical.

Given the purpose of such statutes of repose, it would be surprising if the situation were much different today (although the 1983 recodification of the Illinois Business Corporation Act effective July 1, 1984, Ill.Rev.Stat. ch. 32, ¶ 12.80, changed what had previously been a two-year post-dissolution limitations period to *five* years!). It would subvert (the strong national policy that led to ERISA's enactment in the first place)—a policy that also fueled the congressional effort to close an escape hatch by enacting MPPAA—if the courts were to superimpose a patchwork of state-enacted shorter periods of limitation on employee benefit plans that are seeking to collect on employer withdrawal liabilities.